Cindy Olson Bourland, Justice *789 This suit arises at the crossroads where the First Amendment's protection of free speech and a free press meets the Texas Constitution's protection of the right to bring suit for reputational torts-an area with which the Texas Citizens Participation Act intersects to the extent it provides for early dismissal of some claims. Compare U.S. Const. amend. I ("Congress shall make no law ... abridging the freedom of speech, or of the press....") with Tex. Const. art. I §§ 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege...."), 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation , shall have remedy by due course of law." (emphasis added)); see also generally Tex. Civ. Prac. & Rem. Code §§ 27.001 -.011 (TCPA). In this case, a news story about a former Dallas Cowboy football player, Robert Jones, was posted on the celebrity-news website, TMZ.com. The article's headline reads, "EX-SUPER BOWL CHAMP SUSPECT IN POLICE INVESTIGATION," with a subheading stating, "Allegedly Tried to Hire Hit Man." The article states that Jones allegedly tried to hire a hit man "to take out his agent." TMZ's source for the article was Theodore Watson, Jones's first cousin and a convicted felon. The record indicates that Watson had been harassing Jones and his family and trying to extort money from them. Watson called the TMZ tip line a couple of days after Jones's attorney had sent Watson a cease-and-desist letter. The TMZ article was posted at 2:45 a.m. Central time on June 18, 2014, without first obtaining Jones's reaction to it.[1] Jones's attorney contacted defendant Elizabeth McKernan ("Liz" or "McKernan"), the TMZ associate producer who investigated the story, at 8:00 a.m. Central time that morning. After the attorney sent McKernan a press release on Jones's behalf, an update appeared on TMZ.com later that morning that included some of the information from the press release.
Jones later sued the appellants, Warner Bros. Entertainment, Inc.; Warner Bros. Technical Operations, Inc. d/b/a Warner Bros. Advanced Digital Services; TMZ Productions, Inc.; EHM Productions Inc. d/b/a TMZ; TMZ.com; and Elizabeth McKernan (collectively, "the TMZ Defendants"), for libel, civil conspiracy, intentional infliction of emotional distress, malicious prosecution, and abuse of process, seeking exemplary damages and a permanent injunction. The TMZ Defendants moved to dismiss Jones's claims pursuant to the TCPA, which provides a mechanism for early dismissal of claims in some cases involving First Amendment rights. See In re Lipsky , 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding) ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits."). The trial court allowed limited discovery, including document production and the deposition of McKernan, before conducting a hearing. See Tex. Civ. Prac. & Rem. Code § 27.006(b) (providing that "court may allow specified and limited discovery relevant to the motion" as exception to TCPA's stay of discovery after motion to dismiss is filed). Both sides submitted various affidavits with their motion- *790 to-dismiss briefing. After the hearing, the trial court issued an order stating, "After considering Defendants' motion to dismiss, the responses, the replies, the evidence, the pleadings, and argument of counsel, the Motion to Dismiss is DENIED."
The TMZ Defendants appeal from the trial court's denial of their motion in three issues, contending that (1) the TCPA applies to Jones's suit, (2) Jones failed to establish a prima facie case by clear and specific evidence of each essential element of his claims, and (3) the trial court erred by overruling their objections to Jones's evidence and considering that evidence when ruling on the motion to dismiss. See id. § 51.014(a)(12) (authorizing interlocutory appeal from order denying TCPA motion to dismiss). We conclude that the TCPA applies to the suit but that Jones failed to establish a prima facie case for the essential elements of (1) his claims for libel and civil conspiracy against only TMZ.com and (2) his claims against all appellants for intentional infliction of emotional distress, malicious prosecution, and abuse of process; therefore, we will reverse in part and render judgment dismissing those claims. We further conclude that Jones established a prima facie case against all appellants other than TMZ.com on his libel claim and his conspiracy claim, which is derivative of the libel claim; we will affirm the trial court's decision not to dismiss those claims and will remand the case for further proceedings.
THE TMZ ARTICLE
The initial article appeared on the Sports webpage of TMZ.com at 2:45 a.m. Central time on June 18, 2014. The article's headline was "EX-SUPER BOWL CHAMP SUSPECT IN POLICE INVESTIGATION," with a subheading stating, "Allegedly Tried to Hire Hit Man." The article states it is "BY TMZ STAFF" and "EXCLUSIVE." A picture of Jones in his Dallas Cowboys uniform appears between the headline and the body of the article. The original article stated:
A former Dallas Cowboys linebacker has been named the primary suspect in a police investigation in Cleveland after allegedly trying to hire a hit man to take out his agent ... this according to a police report obtained by TMZ Sports .
The man at the center of the case is Robert Jones -a 1st round pick in the '92 NFL Draft who went on to become a Pro Bowler who won 3 Super Bowls with the Cowboys.
According to the document, a 47-year-old man named Theodore told police that Jones approached him and tried to hire Theo to take out Jones' agent.
Theo told cops he refused-and Jones (who's also 47-years-old)-responded by saying he is a "gangster" and he would make Theodore "disappear."
Theodore told cops he's afraid and fears for his personal safety because he believes Jones will make good on his threat.
So far, Jones has NOT been arrested or charged with a crime. We reached out to Jones several times for comment-so far, no word back.
Later that morning, after McKernan spoke with Jones's lawyer, an update appeared at 10:21 a.m. Central time (8:21 a.m. Pacific time) between Jones's picture and the body of the original article. The update stated:
8:21 AM PT-Jones says the hit man allegations are complete B.S.-and insists he's got a great relationship with his agent.
The former NFL star just issued a statement saying the accuser-a distant relative-"has filed a false police report"
*791 ... and that he "absolutely denies" all allegations.
Jones says he plans on taking legal action of his own against Theodore-and says the guy has "recently been attempting to extort money" from him and his family.
As far as the allegation that he tried to hire a hit man to take out his agent, Jones says the two have a "wonderful relationship" and the notion that he wants him dead is completely false.
After the update, the full article appeared as follows on the Internet:
*792 Later that day, TMZ posted on its Twitter account: "WHOA. Ex-Super Bowl champ, Robert Jones allegedly tried to hire a HIT MAN to kill who?"[2]
BACKGROUND
The following table provides a chronology of events leading up to the publication of the TMZ article. The facts are derived from the evidence the parties submitted with the briefing on the motion to dismiss, which included various affidavits, McKernan's deposition testimony, email correspondence, and phone records.
Date Time Event[3] Tuesday Jones's attorney, Nicholas Bressi, sends Watson a June 10, 2014 cease-and-desist letter advising him to cease communications with Jones and his family or risk the filing of civil and criminal complaints against him and a lawsuit seeking a restraining order. Thursday (unclear from Watson calls Bressi's office and leaves threatening June 12, 2014 record) voice mail. June 12, 2014 9:34-9:45 a.m. CDT Watson calls TMZ tip line. June 12, 2014 9:40 a.m. CDT McKernan emails her contact information to Watson. June 12, 2014 11:36-11:40 a.m. Watson calls McKernan. McKernan did not recall CDT the details of any specific conversations with Watson, but she testified at her deposition that it was reasonable to assume that she had spoken with him on the morning of June 12.
*793 June 12, 2014 12:07-12:09 p.m. McKernan calls Watson. CDT June 12, 2104 3:34 p.m. CDT Bressi emails Watson and asks him to cease communicating with his office. June 12, 2014 4:05 p.m. CDT Watson forwards email from Bressi to McKernan. June 12, 2014 4:19 p.m. CDT Watson sends a follow-up email to McKernan stating, "Miss McKernan the are trying to shut me up or even Kill me." Friday 11:13 a.m. CDT Watson goes to the Cleveland Police Department and June 13, 2014 files an "Offense/Incident Report" ("Incident Report"), alleging that on May 13, 2014, Jones asked Watson to kill Jones's agent and threatened Watson when he refused. June 13, 2014 11:20-11:23 a.m. Watson calls McKernan. CDT Monday 12:49-12:50 p.m. Watson calls McKernan. June 16, 2014 CDT June 16, 2014 1:39 p.m. CDT Watson emails McKernan: "I have the report miss McKernan I will fax it to today what is your fax so that I got the right fax number thank you." June 16, 2014 2:10-2:11 p.m. CDT McKernan calls Watson. June 16, 2014 3:10 p.m. CDT Watson emails McKernan: "I want to go all the way with this espn, nationl enqure, people mag,cnn,talk shows what ever, this way he will not try to kill me the worid will know! The lawyer is herasing me know. I trust you liz this is real. And let jerry jones know he had a killer on his team." McKernan responds, "Did u send fax yet?" Watson responds, "Im in rout to fax." June 16, 2014 3:31 p.m. CDT Watson faxes the Incident Report to McKernan with a cover sheet stating, "This is it. No turning back. Thank you Liz" Tuesday 9:19 a.m. CDT Watson emails McKernan and asks, "Hi miss June 17, 2014 McKernan did you get it and are you working on the story?"
*794 June 17, 2014 9:19 a.m. CDT McKernan responds, "Yes sir! Making calls right now. You doing ok?" June 17, 2014 9:57-9:59 a.m. CDT McKernan calls the Cleveland Police Records Department. June 17, 2014 10:29 a.m. CDT McKernan emails Watson: "I got it! Have to make a few calls this morning. But we should be good to go." Watson responds, "My aunt is worried but in the end its all going to work out." June 17, 2014 4:21 p.m. CDT Watson emails McKernan: "So what do you think about this story? How fare do you think this will go? And do you think this will reach the masses. I have no reason to lie my rep is on the line." June 17, 2014 4:22 p.m. CDT McKernan responds, "We have your back. Posting the story first thing tomorrow morning. It will hit the east coast at 5 a.m. Writing everything up right now. What did police tell you." June 17, 2014 4:34 p.m. CDT Watson responds, "The cops said I did the right thing." McKernan replies, "That's good. What did they say about investigating it?" June 17, 2014 4:49 p.m. CDT Watson responds, "They said should have went to the IBI. This need hit tv I'm ready." June 17, 2014 4:50 p.m. CDT McKernan tells Watson, "It goes up live tomorrow morning. The morning time is our busiest time for the website, and then it will also go on the show ..." June 17, 2014 5:03 p.m. CDT Watson says, "The Austin, Texas cops told me to file here first, then they would go from there. I hope Jerry Jones fineds out" June 17, 2014 6:14 p.m. CDT McKernan emails Watson: "Just making sure your cousin played for cowboys right?" The email includes a link to a Wikipedia page covering Jones's football career. June 17, 2014 7:45 p.m. CDT McKernan messages Jones on Twitter: "This is Liz from @TMZ_sports Can you please follow/DM [direct message] me? We need to talk!" June 17, 2014 7:50 p.m. CDT Jones responds, "What's up Liz," and asks her to DM him.
*795 June 17, 2014 8:07 p.m. CDT McKernan direct messages Jones: "We have a police report that was filed against you claiming you hired a hitman to kill your agent [message break] the alleged victim claims that he is in fear for his life because of this [message break] we wanted to reach out to you about it - because it's hard to believe obviously." She also gives him her phone number. June 17, 2014 8:17 p.m. CDT Jones responds, "Call this number and talk to this guy." The phone number he gives her is his attorney Bressi's cell-phone number. June 17, 2014 At her deposition, McKernan testified that she believes she left Bressi a voice mail on the evening of June 17. The phone records show a two-minute call to Bressi's cell-phone number. June 17, 2014 Jones informs Bressi that McKernan had contacted him about a potential article. Jones told Bressi he had asked McKernan to contact Bressi and asked Bressi to contact McKernan if he had not heard from her. Bressi testifies he did not hear from anyone at TMZ that night. Wednesday 2:45 a.m. CDT TMZ publishes the initial article. June 18, 2014 June 18, 2014 7:45 a.m. CDT McKernan calls the Cleveland Police Department (1-minute call) Public Information Office. June 18, 2014 8:03 a.m. CDT Bressi calls McKernan to discuss the TMZ article and Watson's relationship with Jones. June 18, 2014 8:14 a.m. CDT McKernan sends Bressi the Incident Report. June 18, 2014 10:12 a.m. CDT Bressi sends McKernan a press release from Jones. June 18, 2014 10:21 a.m. CDT TMZ posts an update to the initial article. June 18, 2014 12:30 p.m. CDT TMZ sends out the Twitter post.
[Editor's Note: The preceding image contains the reference for footnote[3] ]
LEGAL FRAMEWORK
All defamation suits encompass the competing constitutional rights to free speech and press and the constitutional right to seek redress for reputational torts. Neely v. Wilson , 418 S.W.3d 52, 56 (Tex. 2013). "To balance these competing interests, the United States Supreme Court through federal constitutional law, th[e] [Texas Supreme] Court through the common law, and the Legislature through statutes, have undertaken to tailor the tort of defamation so as to preserve the right to recover for reputational damages while minimally impinging on the rights to free speech and a free press." Id. at 60. A plaintiff must overcome many hurdles to recover on a defamation claim because "[w]hatever is added to the field of libel is taken from the field of free debate."
*796 New York Times Co. v. Sullivan , 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (recognizing that erroneous statements are inevitable and "must be protected if the freedoms of expression are to have the 'breathing space' " needed to survive).
"Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." Gertz v. Robert Welch, Inc. , 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). "[I]n today's world, we must be especially mindful of this longstanding yet delicate balance, as modern technology allows information to be easily and widely disseminated without necessarily being subjected to the sort of rigorous verification processes that conventional media sources are expected to employ." D Magazine Partners, L.P. v. Rosenthal , 529 S.W.3d 429, 433 (Tex. 2017). Maintaining the proper balance of protecting a free press and protecting the rights of individuals harmed by false or misleading reporting "remains an essential task, and courts continue to struggle 'to define the proper accommodation between these competing concerns.' " Id. (quoting Gertz , 418 U.S. at 342, 94 S.Ct. 2997 ). The Texas Legislature designed the TCPA in part to balance these competing interests. See ids="6173012" index="14" url="https://cite.case.law/us/418/323/#p342">id.
The TCPA's purpose is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002. The Act is to "be construed liberally to effectuate its purpose and intent fully," but it "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." Id. § 27.011. "To effectuate the statute's purpose, the Legislature has provided a two-step procedure to expedite the dismissal of claims brought to intimidate or to silence a defendant's exercise of these First Amendment rights." ExxonMobil Pipeline Co. v. Coleman , 512 S.W.3d 895, 898 (Tex. 2017) (citing Tex. Civ. Prac. & Rem. Code § 27.003 ; In re Lipsky , 460 S.W.3d at 586 ).
First, the Act imposes the initial burden on the litigant who moves to dismiss a legal action to show by a preponderance of the evidence that the nonmovant's claim "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association."[4] Tex. Civ. Prac. & Rem. Code § 27.005(b) ; Coleman , 512 S.W.3d at 898. Most relevant to this case, the Act defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). A " '[c]ommunication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." Id. § 27.001(1). A " '[m]atter of public concern' includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." Id. § 27.001(7)(A)-(E).
The second step of the process shifts the burden to the nonmovant to avoid dismissal by "establish[ing] by clear and specific evidence a prima facie case for each essential *797 element of the claim in question." Id. § 27.005(c). When determining whether to dismiss the legal action, the court must consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." Id. § 27.006(a). The court may allow specified and limited discovery relevant to the motion on a showing of good cause, as it did in this case, but otherwise all discovery in the legal action is suspended until the court has ruled on the motion to dismiss. Id. §§ 27.003, .006(b). Finally, even if the nonmovant meets its burden under the second step, the court must dismiss the action if the movant "establishes by a preponderance of the evidence each essential element of a valid defense" to the nonmovant's claim. Id. § 27.005(d).
We review de novo questions of statutory construction. Molinet v. Kimbrell , 356 S.W.3d 407, 411 (Tex. 2011). We consider de novo the legal question of whether the movant has established by a preponderance of the evidence that the challenged legal action is covered under the Act. Serafine v. Blunt , 466 S.W.3d 352, 357 (Tex. App.-Austin 2015, no pet.) ; see also Rehak Creative Servs., Inc. v. Witt , 404 S.W.3d 716, 725 (Tex. App.-Houston [14th Dist.] 2013, pet. denied), disapproved on other grounds by In re Lipsky , 460 S.W.3d at 587-91. We also review de novo a trial court's determination of whether a nonmovant has presented clear and specific evidence establishing a prima facie case for each essential element of the challenged claims. Serafine , 466 S.W.3d at 357.
ANALYSIS
The TMZ Defendants challenge the trial court's denial of their TCPA motion to dismiss in three issues. They first assert that the Act applies to Jones's lawsuit because they established by a preponderance of the evidence that his suit is based on, relates to, or is in response to their exercise of the right of free speech and their exercise of the right to petition. In their second issue, they contend that Jones failed to carry his burden of establishing a prima facie case by clear and specific evidence of every essential element of his claims for libel, civil conspiracy, intentional infliction of emotional distress, malicious prosecution, and abuse of process. The TMZ Defendants argue in their third issue that the trial court erred by overruling their objections to affidavits submitted by Jones, and as a result, improperly considered inadmissible evidence when ruling on the motion to dismiss.
Does the TCPA apply to Jones's suit?
We first consider whether the TMZ Defendants satisfied their burden of proving by a preponderance of the evidence that Jones's lawsuit is based on, relates to, or is in response to their exercise of the right of free speech and their exercise of the right to petition. The parties do not dispute that the claims asserted by Jones in his petition are based on the article posted by the TMZ Defendants. Thus, we must decide whether the article satisfies the Act's definition of the "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). As noted above, a " '[m]atter of public concern' includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." Id. § 27.001(7)(A)-(E). The TMZ Defendants assert that the article involved a matter of public concern because the initial story described "a police report recounting an alleged plot by a decorated former professional football player to hire a hitman to murder his sports agent, and an alleged *798 threat to harm Watson if the plot was not executed." They assert that this was a matter of public concern because (1) Jones is a public figure; (2) the article relates to the government because it involves a police report and operations of the police department, a governmental entity; (3) the article relates to community well-being; and (4) the article relates to health and safety issues.
More specifically, the TMZ Defendants contend that because the article described the police report made by Watson, which documented his "rendition of Jones'[s] role in a murder-for-hire plot, the assignment of a police unit to investigate the charges, and the referral of the matter to the prosecutor's office for possible additional investigation," the article relates to the government, to community well-being, and to health and safety issues. The TMZ Defendants argue that courts have applied the TCPA when a statement concerns an individual's safety. See Cavin v. Abbott , --- S.W.3d ----, ---- - ----, No. 03-16-00395-CV, 2017 WL 3044583, at *10-11 (Tex. App.-Austin July 14, 2017, no pet.) (concluding that statements making accusations of mental illness and domestic abuse related to health and safety); Backes v. Misko , 486 S.W.3d 7, 18 (Tex. App.-Dallas 2015, pet. denied) (concluding that statement about parent's mental health and child's possible abuse involved both health and safety and satisfied the statutory definition of "matter of public concern"); Bilbrey v. Williams , 02-13-00332-CV, 2015 WL 1120921, at *9 (Tex. App.-Fort Worth Mar. 12, 2015, no pet.) (concluding that statements made by youth baseball association coach to president of association about assistant coach's behavior at game relate to the health, safety, and well-being of children in community). Jones responds that the article was not a report on a matter of public concern because his suit complains that the article published by the TMZ Defendants reports only claims of someone he characterizes as "an anonymous stalker" whom they encouraged to file a fictitious complaint-a complaint that they then characterized as showing a "nonexistent, ongoing 'investigation' and 'case' in the hopes that their story would itself cause an investigation." For purposes of determining whether the TCPA applies, however, courts do not consider the truth of the statements made; instead, we look solely to their subject matter. In this case, the article reported that Jones had allegedly tried to hire a hit man to kill his agent and then threatened to make Watson "disappear" when he refused to kill Jones's agent. See Backes , 486 S.W.3d at 18 (noting that dictionary defines "safety" as "the condition of being safe: freedom from exposure to danger: exemption from hurt, injury, or loss" (quoting Webster's Third New Int'l Dictionary 1998 (1981))). The statements concern the safety of both Jones's agent and Watson, and thus, they satisfy the statutory definition of "matter of public concern." We conclude that the evidence shows that the article was "a communication made in connection with a matter of public concern," and thus, an exercise of the TMZ Defendants' right of free speech. See Tex. Civ. Prac. & Rem. Code § 27.001(3), (7)(A). We agree that the TCPA applies to the case, and we sustain the TMZ Defendants' first issue.[5]
*799 Did Jones establish a prima facie case for the essential elements of his claims?
Having determined that the TMZ Defendants have shown that the TCPA applies because Jones's claims relate to their exercise of the right of free speech, we next consider whether Jones "establishe[d] by clear and specific evidence a prima facie case for each essential element" of his claims. Id. § 27.005(c). To make this determination, we are to consider the pleadings and any supporting and opposing affidavits. Id. § 27.006(a).
Neither the TCPA nor the common law defines "clear and specific" evidence; consequently, we give these terms their ordinary meaning. In re Lipsky , 460 S.W.3d at 590. "Clear" means "free from doubt," "sure," or "unambiguous." Clear , Black's Law Dictionary (10th ed. 2014); In re Lipsky , 460 S.W.3d at 590 (approving this definition of "clear"); see also Webster's Third New Int'l Dictionary 419 (2002) (defining "clear" as "easily understood," "without obscurity or ambiguity," "easy to perceive or determine with certainty"). "Specific" means "explicit" or "relating to a particular named thing." Specific , Black's Law Dictionary ; In re Lipsky , 460 S.W.3d at 590 (approving this definition of "specific"); see also Webster's Third New Int'l Dictionary 2187 (defining "specific" as "being peculiar to the thing or relation in question," "characterized by precise formulation or accurate restriction," or "free from such ambiguity as results from careless lack of precision or from omission of pertinent matter"). The supreme court has concluded that the "clear and specific" evidentiary standard does not exclude circumstantial evidence from consideration. In re Lipsky , 460 S.W.3d at 589. Circumstantial evidence is "indirect evidence that creates an inference to establish a central fact," and "[i]t is admissible unless the connection between the fact and the inference is too weak to be of help in deciding the case." Id. In some cases, the determination of certain facts "may exclusively depend on such evidence." Id. ; see, e.g. , Bentley v. Bunton , 94 S.W.3d 561, 596 (Tex. 2002) (considering defamation claim and noting that claims involving proof of defendant's state of mind "must usually [ ] be proved by circumstantial evidence"). The term "clear and specific evidence" refers to the quality of evidence required to establish a prima facie case, while the term "prima facie case" refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden. See Combined Law Enf't Ass'n of Tex. v. Sheffield , No. 03-13-00105-CV, 2014 WL 411672, at *10 (Tex. App.-Austin Jan. 31, 2014, pet. denied) (mem. op.).
A "prima facie case" "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." In re Lipsky , 460 S.W.3d at 590 (citing Simonds v. Stanolind Oil & Gas Co. , 134 Tex. 332, 136 S.W.2d 207, 209 (1940) ). "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.' " Id. (quoting In re E.I. DuPont de Nemours & Co. , 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case."
*800 Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc., 441 S.W.3d 345, 355 (Tex. App.-Houston [1st Dist.] 2013, pet. denied) (citing In re E.I. DuPont , 136 S.W.3d at 223-24 ); see also In re Lipsky , 460 S.W.3d at 592 (explaining that "bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case" under TCPA). Thus, we must decide whether the record, including the pleadings and supporting and opposing affidavits, contains a minimum quantum of clear and specific evidence necessary to support a rational inference establishing each essential element of Jones's claims.
I. Defamation
Defamation includes libel and slander. Neely , 418 S.W.3d at 60. Jones's claim in this suit is for libel, which occurs when the defamatory statements are expressed in written form. See ids="7252811" index="54" url="https://cite.case.law/sw3d/418/52/#p56">id. ; see also Tex. Civ. Prac. & Rem. Code § 73.001 (defining libel). To establish the elements of a defamation claim, the plaintiff must show that the defendant: (1) published a false statement of fact to a third party; (2) that defamed the plaintiff; (3) while acting either with actual malice (if the plaintiff was a public official or public figure) or negligence (if the plaintiff was a private individual) regarding the truth of the statement; and (4) the statement caused damages, unless the statement constitutes defamation per se. See In re Lipsky , 460 S.W.3d at 593 ; WFAA-TV, Inc. v. McLemore , 978 S.W.2d 568, 571 (Tex. 1998). When the challenged statement accuses someone of committing a crime, it is defamatory per se, and the plaintiff need not show actual damages. See D Magazine Partners , 529 S.W.3d at 439. The common law and statutes provide certain defenses and privileges to defamation claims, including the defense of truth. Neely , 418 S.W.3d at 62 (citing Tex. Civ. Prac. & Rem. Code § 73.005 ).
The TMZ Defendants do not assert that the article is true or that it is not defamatory per se. They only assert that Jones did not establish a prima facie case that each of them actually published the statements at issue and that they acted with actual malice. They also assert that Jones never requested a correction, clarification, or retraction of the article, and therefore, the suit is barred by the Defamation Mitigation Act. See generally Tex. Civ. Prac. & Rem. Code §§ 73.051 -.062.
As explained above, the Texas Supreme Court has rejected the idea that the TCPA establishes a heightened evidentiary standard or prohibits circumstantial evidence. In re Lipsky , 460 S.W.3d at 591. "[A] plaintiff must provide enough detail to show the factual basis for its claim. In a defamation case that implicates the TCPA, pleadings and evidence that establish[ ] the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." Id. Jones urges that when considering whether he presented a prima facie case, we should consider only the pleadings and evidence in favor of his case, as some of our sister courts have. See Fawcett v. Grosu , 498 S.W.3d 650, 661 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) ; D Magazine Partners, L.P. v. Rosenthal , 475 S.W.3d 470, 480-81 (Tex. App.-Dallas 2015) ("We do not consider whether the defendant presented evidence rebutting the plaintiff's case; such evidence is appropriate in determining a defendant's motion for summary judgment or at trial but not in determining whether the plaintiff presented a prima facie case."), aff'd in part on other grounds, rev'd in part on other grounds, 529 S.W.3d 429 (Tex. 2017). This Court, however, at least when considering the first step of the TCPA analysis (whether the defendant has demonstrated *801 by a preponderance of the evidence that the TCPA applies to the plaintiff's claims), has followed those courts of appeals who examine all the pleadings and the evidence in the light most favorable to the plaintiff. Compare, e.g. , Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd. , 416 S.W.3d 71, 80-81, 83 (Tex. App.-Houston [1st Dist.] 2013, pet. denied) (holding pleadings and evidence to be reviewed in light favorable to plaintiffs and considering "record as a whole" and evidence submitted by both sides when considering second step of TCPA analysis, i.e., whether plaintiffs established prima facie case for claims), with, e.g. , Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion, 517 S.W.3d 212, 218 (Tex. App.-Austin 2017, no pet.) (stating governing standard of review requires evidence to be viewed in light most favorable to plaintiffs when considering first step of TCPA analysis, i.e., whether TCPA applies to plaintiffs' claims). Consequently, we will follow the standard our Court has previously applied to the first step of the TCPA analysis, and we will review all the pleadings and evidence in the light most favorable to Jones when considering the second step of the TCPA analysis-whether Jones has marshaled the clear and specific evidence necessary to support a prima facie case for each element of his claims. If a plaintiff provides evidence that establishes a prima facie case if left uncontradicted and unexplained, the prima facie case only disappears "when the true facts are conclusively shown by other evidence." Simonds , 136 S.W.2d at 209.
A. Publication
The first defamation element we consider is whether Jones established a prima facie case that each of the TMZ Defendants "published" the statements. The TMZ Defendants include five corporate defendants, (1) Warner Bros. Entertainment, Inc.; (2) Warner Bros. Technical Operations, Inc., d/b/a Warner Bros. Advanced Digital Services; (3) TMZ Productions, Inc.; (4) EHM Productions Inc. d/b/a TMZ; (5) TMZ.com; and an individual defendant, (6) Elizabeth McKernan. Jones alleged that "Defendants were the owners, operators and publishers of various publications that printed articles about plaintiff and acted wrongfully in the publication of the defamatory statements in that such statements were based on false claims." He further alleged that they acted with actual malice and that they "permitted the statements to be published even though [they] knew the statements were false and had participated in fabricating the statements."
We first examine whether Jones has established a prima facie case of publication by the various corporate defendants. In response to the motion to dismiss, Jones submitted evidence of the TMZ Defendants' notification to the public of the various relationships among the corporate defendants. At the time of the motion to dismiss, the name "EHM Productions, Inc." appeared at the bottom of the home page of the TMZ.com website. The TMZ.com website contained multiple links to webpages entitled "Privacy Policy," "Terms of Use," and "About TMZ.com" (which linked to "TMZ legal inquiry" leading to another "Terms of Use" page). The first "Terms of Use" document stated, *802 "Welcome to TMZ, a Warner Bros. Entertainment Group company.... This Site is controlled and operated by Warner Bros. Entertainment Inc....." (Emphasis added.) This document also contained a list of The Warner Bros. Entertainment Group of Companies. The list named 21 companies, including one called "TMZ Productions Inc." The "TMZ legal inquiry" link led in turn to another "Terms of Use" document. The second "Terms of Use" document stated, "Welcome to TMZ, a Warner Bros. Entertainment Group company.... This Site is controlled and operated by Warner Bros. Advanced Digital Services, a division of Warner Bros. Technical Operations Inc. and/or Warner Bros. Entertainment Inc....." (Emphasis added.) The privacy policy stated that it "provides highlights of Warner Bros. Entertainment Inc.'s ('WBEI,' 'we,' 'our,' 'us') Privacy Policy. Our full Privacy Policy applies to WBEI Web Sites...."
In Texas, the general rule is that "[a]n action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty. Neither express authorization nor subsequent ratification is necessary to establish liability." Texam Oil Corp. v. Poynor , 436 S.W.2d 129, 130 (Tex. 1968) ; see also Minyard Food Stores, Inc. v. Goodman , 80 S.W.3d 573, 577 (Tex. 2002) (holding that general rule that employer is liable for its employee's tort "when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired" applies in defamation context). Accordingly, we conclude that Jones's evidence, if unrebutted, suffices to establish a prima facie case that the corporate defendants published the information on the TMZ website.
In reply to Jones's response, the TMZ Defendants filed an affidavit from Jason Beckerman, the in-house counsel of EHM Productions, Inc. In his affidavit, Beckerman testified that he had personal knowledge about the corporate structure of the various defendants and was familiar with TMZ.com, "the website run by EHM." Beckerman disclaimed responsibility for publication by three of the six defendants. He testified that the defendant identified as "Warner Bros. Entertainment, Inc." is the indirect parent company of Defendant Warner Bros. Technical Operations, Inc. and the partial indirect parent company of EHM. He further stated, "[a]s such, and in that role, Warner Bros. Entertainment, Inc. did not publish the news story." Beckerman also testified that the defendant identified as "TMZ Productions, Inc." "has no operational function, and it had no operational function on the date of the publication of the news story," and therefore did not publish the story. Finally, Beckerman testified that the defendant identified as "TMZ.com" "does not exist as a legal entity, and it did not exist as a legal entity" on the date of the article; he concluded, "It, therefore, did not publish the news story." Beckerman did not aver that Warner Bros. Technical Operations, EHM Productions, or McKernan did not publish the article.
As noted above, Jones argues that we should not consider Beckerman's self-serving affidavit at all. We will consider the affidavit in the light most favorable to Jones, but conclusive evidence can overcome the prima facie case that Jones has established against the corporate defendants. Beckerman's affidavit is the testimony of an interested witness, and as such, it could only establish an issue as a matter of law if "the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." See Tex. R. Civ. P. 166a(c) (explaining when summary judgment may be based on interested-witness testimony). Moreover, " '[b]are, baseless opinions will not support a judgment even if there is no objection to their admission in evidence,' and we have 'often held that such conclusory testimony cannot support a judgment.' "
*803 Elizondo v. Krist , 415 S.W.3d 259, 264 (Tex. 2013) (quoting City of San Antonio v. Pollock , 284 S.W.3d 809, 816 (Tex. 2009), and Coastal Transp. Co. v. Crown Cent. Petrol. Corp. , 136 S.W.3d 227, 232 (Tex. 2004), respectively). Beckerman's conclusory statement that Warner Bros. Entertainment, Inc., as the partial indirect parent of Warner Bros. Technical Operations and EHM Productions, "[a]s such, and in that role, ... did not publish the news story" is contradicted by the statements on the website that the site is "controlled and operated by Warner Bros. Entertainment Inc....." (Empahsis added). The affidavit is "devoid of any specific facts" explaining why Warner Bros. Entertainment, Inc. does not control and operate the site as stated on the website and thus cannot be conclusive evidence that Warner Bros. Entertainment, Inc. did not publish the article. Cf. In re Lipsky , 460 S.W.3d at 592-93. Likewise, TMZ Productions, Inc. was listed as one of The Warner Bros. Entertainment Group of Companies in the first "Terms of Use" document on the site, despite Beckerman's averment that it has no operational function and his conclusion that therefore it did not publish the article. This inconsistency between the website's public disclosures and Beckerman's interested testimony precludes us from viewing his testimony as conclusive proof that TMZ Productions, Inc. did not publish the article. We conclude that Beckerman's interested testimony is insufficient to overcome the prima facie case established by Jones that Warner Bros. Entertainment Inc. and TMZ Productions, Inc. published the article.[6]
As for TMZ.com, Jones argues that Rule 28 provides that a party may sue an entity doing business under an assumed name to preserve its substantive rights, and that the website name "TMZ.com" is an example of a trade name. See Tex. R. Civ. P. 28 ; Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp. , 53 S.W.3d 799, 810 (Tex. App.-Austin 2001, pet. denied) (explaining that trade name plus ".com" is often company's website name). Rule 28 provides that on a motion by any party the true name of the correct entity may be substituted, but as Jones points out, the TMZ Defendants made no such motion here. However, Beckerman declares that TMZ.com is an Internet website and does not exist as a legal entity, and therefore, he concludes it did not publish the article. In essence, this is an argument that TMZ.com lacks the capacity to be sued. To be more precise, TMZ.com is actually the domain name under which the website is built. Both domain names and websites are assets, not legal entities with the capacity to file or defend a suit. See, e.g. , uBID, Inc. v. GoDaddy Group, Inc. , 623 F.3d 421, 424 (7th Cir. 2010) (explaining that GoDaddy's customers buy domain names from GoDaddy and some customers build websites under those domain names); Restrepo v. Alliance Riggers & Constructors, Ltd. , 538 S.W.3d 755, 757-59, No. 08-16-00032-CV, 2017 WL 4216267, at *2-3 (Tex. App.-El Paso Sept. 22, 2017, no pet.) (affirming turnover order requiring appellants to turn over domain name); Clogston v. Clogston , No. 03-14-00479-CV, 2015 WL 8591609, at *1 (Tex. App.-Austin Dec. 10, 2015, no pet.) (mem. op.) (case involving post-divorce rights to domain name and content located at website address);
*804 Hardriders Motorcycle Club Ass'n v. Hardriders, Inc. , No. 14-14-00234-CV, 2015 WL 5025526, at *3 (Tex. App.-Houston [14th Dist.] Aug. 25, 2015, pet. denied) (mem. op.) (case involving suit over rights to trademark, trade name, domain name, and website); see also Nootsie, Ltd. v. Williamson Cty. Appraisal Dist. , 925 S.W.2d 659, 661 (Tex. 1996) ("A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy."). As a result, we agree that the TMZ Defendants have conclusively shown that the domain name, TMZ.com, which lacked the legal authority to act, did not publish the article.
With regard to the individual defendant McKernan, the TMZ Defendants argue that "the uncontroverted evidence establishes that McKernan did not even write any of the news story, much less 'publish' it." The allegedly "uncontroverted evidence" upon which Defendants rely is McKernan's own affidavit in which she states:
The news story was published on June 18, 2014. I did not write or publish the news story made the basis of Plaintiff's lawsuit. Instead, the news story was written by my former boss. Also, as a sports section producer, I had no ability to publish anything on the TMZ.com website.
However, the evidence offered by Jones includes emails between McKernan and Watson showing that McKernan was the only person communicating with Watson, and in one of those emails, she states, "Writing everything up right now." In her deposition, McKernan testified that she was the lead investigator bringing the story and the information to her supervisor, who was drafting the article while she was there with him contributing to the process along with one of the in-house lawyers who was there to advise them. She testified that she read the article as her supervisor wrote it and that she did not have any problem with its accuracy, thoroughness, or completeness. She also gathered the information for the update and gave it to her supervisor to write up. Viewed in the light most favorable to Jones, the evidence of McKernan's direction of and participation in the process of writing the defamatory article establishes a prima facie case of the element of publication, and McKernan's self-serving affidavit offered in rebuttal does not conclusively prove she did not "publish" the article. See Leyendecker & Assocs. v. Wechter , 683 S.W.2d 369, 375 (Tex. 1984) ("A corporation's employee is personally liable for tortious acts which he directs or participates in during his employment," including defamation.).
Accordingly, we conclude that Jones established by clear and specific evidence a prima facie case of the element of publication against all the TMZ Defendants, except the domain name TMZ.com.[7]
B. Actual malice
The TMZ Defendants also assert that Jones failed to marshal clear and specific evidence to support a prima facie case of actual malice.[8] Jones contends that the *805 evidence, including the evidence of the timing of Watson's communication with McKernan immediately followed by his filing of the Incident Report, combined with the evidence of McKernan's purposeful avoidance of the truth of the publication, supports a prima facie case of actual malice. In the defamation context, "actual malice" means "that the defendant made the statement 'with knowledge that it was false or with reckless disregard of whether it was true or not.' " Huckabee v. Time Warner Entm't Co. , 19 S.W.3d 413, 420 (Tex. 2000) (quoting New York Times , 376 U.S. at 279-80, 84 S.Ct. 710 ). "Reckless disregard" is a term of art. Id.
"Knowledge of falsity is a relatively clear standard; reckless disregard is much less so." Bentley , 94 S.W.3d at 591. Reckless disregard is a subjective standard that focuses on the defendant's conduct and state of mind. Id. The actual-malice inquiry focuses on the defendant's state of mind during the editorial process and at the time of publication. Forbes Inc. v. Granada Biosciences, Inc. , 124 S.W.3d 167, 173-74 (Tex. 2003). Showing reckless disregard requires more than mere negligence and " 'a departure from reasonably prudent conduct.' " Bentley , 94 S.W.3d at 591 (quoting Harte-Hanks Commc'ns, Inc. v. Connaughton , 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ). To establish reckless disregard, a public figure must provide sufficient evidence that the publisher " 'entertained serious doubts as to the truth of his publication' " or had " 'a high degree of awareness of ... probable falsity.' " Harte-Hanks , 491 U.S. at 688, 109 S.Ct. 2678 (quoting St. Amant v. Thompson , 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and Garrison v. Louisiana , 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), respectively).
"The defendant's state of mind can-indeed, must usually-be proved by circumstantial evidence." Bentley , 94 S.W.3d at 596 ; Franco v. Cronfel , 311 S.W.3d 600, 607 (Tex. App.-Austin 2010, no pet.). "[A]ctual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication." Dolcefino v. Turner , 987 S.W.2d 100, 111-12 (Tex. App.-Houston [14th Dist.] 1998), aff'd sub nom. Turner v. KTRK Television, Inc. , 38 S.W.3d 103, 120 (Tex. 2000) (explaining plaintiff can prove actual malice "through objective evidence about the publication's circumstances"); see also Bentley , 94 S.W.3d at 591, 596 (stating that defendant's lack of care and motive are factors to consider). "The evidence must be viewed in its entirety." Bentley , 94 S.W.3d at 596.
A defendant's self-serving protestations of good-faith belief in the statements' truth cannot alone suffice to disprove actual malice. Id. (allowing that defendant's testimony about his own reasoning and reasons for his actions may be able to negate actual malice conclusively when evidence is viewed as a whole). The court in Bentley described some of the circumstances that courts should consider:
A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are *806 factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something may be true is not the same as belief.
Id. (emphases added). In other words, while a negligent failure to investigate the facts, standing alone, is not sufficient evidence of a reckless disregard for the truth, in a case involving the reporting of a third party's allegations, " 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " Harte-Hanks , 491 U.S. at 688, 109 S.Ct. 2678 (quoting St. Amant , 390 U.S. at 732, 88 S.Ct. 1323 ).
The parties' arguments about actual malice revolve around the quality of the TMZ Defendants' investigation before the article's publication. Jones asserted in response to the motion to dismiss that the weight of the circumstantial evidence in this case demonstrated not only that the TMZ Defendants had "serious doubts" about the truth of its publication, but that they also had knowledge that the statements were false. Jones argued that the story itself was inherently implausible, that the TMZ Defendants selectively omitted certain facts from the story and deliberately distorted others, and that it was essentially based on an unverified, anonymous account that the TMZ Defendants assisted in fabricating. On appeal, the TMZ Defendants primarily rely on their assertion that they did not act with actual malice because they accurately reported the contents of the report that Watson filed with the Cleveland Police Department. They also contend that Jones's allegations that McKernan failed to adequately research the story and relied too heavily on Watson's statements are no evidence of actual malice. They point to evidence of the steps McKernan took before the article's publication as evidence of her appropriate investigation and her belief that the publication was correct. Finally, they assert that their failure to retract the news story after Jones denied the allegations is also no evidence of actual malice.
We begin by noting the gravity of the accusations made against Jones. The article alleges that Jones "has been named the primary suspect" in a plot to hire a hit man (Watson) to kill his agent. The article further alleges that when Watson refused to participate, Jones responded that he is a "gangster" and would make Watson "disappear." The allegations against Jones in this case are far more serious than those that factored into the Supreme Court's decision that the evidence supported a finding of actual malice in Curtis Publishing Co. v. Butts . See 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in result) (joined by majority of Court in extending New York Times standard to public figures other than public officials). Butts involved a defamatory article about the plaintiff's alleged involvement in a conspiracy to "fix" a college football game between University of Georgia and University of Alabama, and the Court noted that although the magazine editors "recognized the need for thorough investigation of serious charges," they ignored elementary precautions. Id. at 157, 87 S.Ct. 1975. Charges as serious as the ones leveled against Jones in this article deserve a correspondingly high standard of investigation. See ids="6167825" index="117" url="https://cite.case.law/us/388/130/#p164">id.
The investigation in this case suffers from a shortcoming similar to that of the investigations in Butts and in Harte-Hanks ; the Supreme Court held that both *807 of those investigations supported findings of actual malice. As happened in both of those investigations, the TMZ Defendants here relied on a single dubious source for their allegations. See Harte-Hanks , 491 U.S. at 692, 109 S.Ct. 2678 (citing undisputed evidence that publisher failed to make any effort to interview key witness or to listen to tapes of key witness's interview); Butts , 388 U.S. at 157-58, 87 S.Ct. 1975 (citing evidence that magazine editors ignored fact that informant was on probation and also sought no independent corroboration from another available witness or from football experts). Although the TMZ Defendants assert that they were merely reporting the allegations made by Watson to the police as documented in the Incident Report, the circumstantial evidence of the timing of Watson's first call to the TMZ tip line being immediately followed by his report to the police supports an inference that Watson only reported the alleged incident to the police because McKernan or someone else at TMZ told him that TMZ needed some sort of official report to publish his allegations. Furthermore, despite Watson's claim that he was afraid for his life, his reports to TMZ and to the Cleveland police were made 30 days after the date that he alleged Jones approached and threatened him. In addition, his first report was to TMZ, not the police.
The TMZ Defendants do not dispute that no one investigated Watson to determine whether he was a credible source. Jones presented evidence that Watson is a convicted felon and has a fairly lengthy criminal history, both easily verifiable matters of public record.[9] In addition, the communications between McKernan and Watson produced by the TMZ Defendants in discovery demonstrate that there were inconsistencies in the story that Watson told McKernan, beyond the questionable timing of his report to police, that show a lack of plausibility in Watson's story. The gist of the story that Watson told McKernan was that he was afraid for his life because Jones had threatened him after Jones asked Watson to kill his agent and Watson refused. He also told her that Jones told him "that the NFL was nothing but mafia that's a nother reason I'm in fear." The same day that they first spoke on the phone, Watson forwarded McKernan a copy of an email from Jones's attorney, Nicholas Bressi, thirty minutes after Watson received it. The email's subject line was "Robert Jones/Watson." The email stated:
Mr. Watson:
I received a message that you called my office today. I have no intention of speaking with you as there's nothing to discuss and I have no reason or need to speak with you. All that needs to be said was set forth in my letter. Please cease communicating with my office.
At her deposition, McKernan testified that this message instructing Watson to stop calling Jones's attorney caused her to believe that Watson was afraid for his safety because his relationship with Jones "had gone sour." She did not ask Watson to provide her with a copy of the referenced letter and she "didn't know" whether the contents of that letter might be important or relevant to the story Watson was telling her. She thinks that Watson sent her the *808 email to prove to her that he had a relationship with Jones. About fifteen minutes after sending her the email from Bressi with no explanatory cover email, Watson sent her another email that said: "Miss McKernan the are trying to shut me up or even Kill me." McKernan testified that she interpreted that email to mean that Watson was in fear for his life, even though Bressi's email said only to stop calling his office and that his prior letter said everything that needed to be said.
McKernan also testified that she did not know whether Watson was a stalker or whether he was mentally unstable. The email correspondence between Watson and McKernan before the article was published includes emails in which Watson stated:
I want to go all the way with this espn, nationl enqure, people mag, cnn, talk shows what ever, this way he will not try to kill me the worid will know! The lawyer is herasing me know. I trust you liz this is real. And let jerry jones know he had a killer on his team," and "So what do you think about this story? How fare do you think this will go? And do you think this will reach the masses. I have no reason to lie my rep is on the line."
McKernan admitted that she did not know whether he was telling her the truth. "Imagining that something may be true is not the same as belief." Bentley , 94 S.W.3d at 596.
Watson's email correspondence with McKernan supports an inference that McKernan purposefully avoided inquiring into the details of Watson's relationship with Jones by failing to ask why Jones's attorney Bressi sent Watson a letter, what the letter said, and why Bressi wanted Watson to stop communicating with his office. McKernan did not contact Bressi to inquire into the details of Jones and Watson's relationship, even though the email included Bressi's contact information. The correspondence supports the further inference that McKernan purposefully avoided considering the plausibility of Watson's story that Jones desired to have his agent murdered and threatened Watson when he refused to do the job, given that Jones had his attorney send Watson a letter saying "[a]ll that needs to be said" and the attorney asked Watson to stop communicating with his office.
Furthermore, the TMZ Defendants failed to meaningfully seek corroboration of Watson's story from any other sources, including Jones. McKernan never called Jones's sports agent, despite the fact that his life was purportedly in danger and that he would have been able to provide more information about his current relationship with Jones and why Jones would want to hire someone to kill him. She said the agent was not named, and she was not sure whether she had ever asked what his name was. She could not remember whether she had ever done any investigation to find out who he was.
The timing of McKernan's effort to contact Jones also supports an inference of purposeful avoidance. Although the initial article stated, "We reached out to Jones several times for comments-so far, no word back," McKernan in fact contacted Jones via a direct message on Twitter at about 8:00 p.m. Central time on June 17 before the story was published and received a response. McKernan's message stated, "We have a police report that was filed against you claiming you hired a hitman to kill your agent [message break] the alleged victim claims that he is in fear for his life because of this [message break] we wanted to reach out to you about it-because it's hard to believe obviously. " (Emphasis added.) Jones responded, "Call this number and talk to this guy," and *809 gave her Bressi's cell-phone number. McKernan testified that she assumed the number was his attorney's number because of the email that Watson had previously sent her. Although McKernan testified both at her deposition and in her later affidavit that she left Bressi a voice mail that night, Bressi stated in his affidavit that he did not receive any communication from McKernan or anyone else affiliated with TMZ that evening. Bressi called McKernan at the number that Jones had given him at about 8:00 a.m. Central time the next morning. By then, TMZ had published the article. When asked whether there was any particular reason why the article needed to be published at 12:45 a.m. Pacific time (2:45 a.m. Central time) on June 18 and why TMZ couldn't have taken another day to investigate, McKernan's only response was, "We had the story and we decided to post."
Finally, the TMZ Defendants' acts after publication support an inference that their article was a "calculated falsehood" or that they recklessly disregarded its truth. See Turner , 38 S.W.3d at 120 ("A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading."). McKernan testified that after she spoke to Bressi, the only thing she did to further investigate Watson's allegations was read the email that Bressi sent her. After they spoke on the morning of June 18, Bressi emailed her a press release on Jones's behalf. While the update posted on TMZ.com that morning contained some of the information in the Jones press release, it omitted the following information, which would have undermined the story's source:
[Watson] has been harassing Mr. Jones and his family for the past several months. Mr. Watson received a cease and desist letter from Mr. Jones' lawyer last week and after receiving that letter apparently Mr. Watson decided to escalate his extortion attempts by filing a false police report against Mr. Jones then circulating the false report to the media.
Jones suggests that the fact that he had asked an attorney to take action against Watson before Watson filed his Incident Report is inconsistent with the idea that Jones is someone who claims to be a "gangster" and threatened to make Watson "disappear" and that it explains Watson's motive for filing a false report about Jones. TMZ's decision to omit this information supports an inference that they knew the story was false or recklessly disregarded whether it was true. McKernan testified that she did not recall following up on the article at all once the update was published and that she did not know whether anyone else did. She considered it finished at the time it was updated. She did not know whether she ever called Watson after to find out whether he was "still alive."
The TMZ Defendants argue that a "mere failure to investigate the facts, by itself, is no evidence of actual malice," and therefore, McKernan's reliance solely on Watson and her failure to check other sources have no bearing on a determination of actual malice. See Bentley , 94 S.W.3d at 595. While we agree that a failure to investigate, standing alone, does not suffice to establish a prima facie case of actual malice, all of the circumstances present here support finding a prima facie case because " 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " Id. at 596 (quoting St. Amant , 390 U.S. at 732, 88 S.Ct. 1323 ). The TMZ Defendants assert that McKernan's investigation was appropriate in all respects. Under the circumstances presented by this case, we disagree. McKernan's *810 investigation consisted of speaking with Watson and reviewing documents he sent her, confirming that the Incident Report was "open" with the Cleveland Police Department, and reaching out to Jones shortly before the story was published but not waiting to obtain a substantive response. After the story was published, she updated the article after receiving the press release but omitted certain portions of the press release. The seriousness of the allegations against Jones required a more thorough investigation, not one where elementary precautions were ignored. See Butts , 388 U.S. at 157, 87 S.Ct. 1975.
To rebut Jones's prima facie case on actual malice, the TMZ Defendants also rely heavily on their argument that they were merely reporting what was in the police department's Incident Report. Accordingly, they assert, the relevant question is whether they falsely represented the contents of the document. We note that the Texas Supreme Court has reaffirmed the "well-settled legal principle that one is liable for republishing the defamatory statement of another." Neely , 418 S.W.3d at 56, 61. While we disagree that the accuracy of their representation of the Incident Report's contents is the only relevant question, we observe that "[a] broadcaster's omission of facts may be actionable if it so distorts the viewers' perception that they receive a substantially false impression of the event." Huckabee , 19 S.W.3d at 425. Although, as previously noted, the TMZ Defendants have not challenged whether Jones established a prima facie case of falsity, if Jones has shown that the TMZ Defendants selectively omitted facts with "the awareness that the omission could create a substantially false impression," that further supports a prima facie case of actual malice. See ids="9131085" index="132" url="https://cite.case.law/sw3d/19/413/#p420">id. at 426. The juxtaposition of the facts that the TMZ Defendants chose to include from the Incident Report creates the impression that Jones is the primary suspect in a police investigation because he tried to hire a hit man to take out his agent. But the Incident Report indicates that Watson is named as the "primary victim" of the offense of "aggravated menacing." Also, even though the document states "N" next to "Gang Related" and "No Gang" next to "Criminal Activity," the TMZ Defendants omitted this information from the article but included Watson's statement that Jones told him he was a "gangster" and would make Watson disappear. In conjunction with all of the circumstances surrounding the article's publication and considering the evidence in the light most favorable to Jones, the TMZ Defendants' selective omission of certain information is further evidence supporting Jones's prima facie case of actual malice.
The parties also join issue over whether the TMZ Defendants misrepresented the nature of the document created by the Cleveland Police Department and whether the TMZ Defendants knowingly or recklessly misrepresented that the police were actually investigating Jones, when in fact, they were not. Jones offered the affidavit of an expert witness on the Department's procedures, Jamie Serrat, an attorney who practices criminal law and has experience with criminal investigations in Cleveland, Ohio. In addition to offering his opinions on the Cleveland Police Department's procedure, Serrat also interviewed the police officer indicated as the reporting officer on the document titled "Offense/Incident Report," which we have referred to as the "Incident Report." Serrat testified that this type of document "should never be referred to as a "Police Report" because "Field Reports/Police Reports are typically generated after a suspect is arrested" and they contain different information because they are the product of independent police investigation or police work. In contrast, *811 Serrat testified, an Incident Report documents a complaint made by a citizen to an assessing police officer whose "job and responsibility" it is "to assess what has been alleged and assign the matters complained to a potential charge in accordance with the Ohio penal codes." Serrat further explained that the police only begin an investigation if they determine a felony has been reported. If the police determine that the report is a misdemeanor, "[t]he complainant is told that if they want to file criminal charges, they must go to the City of Cleveland Prosecutor's Office located within the Justice Center to meet with a Prosecutor to see if the pursuit of any criminal charges is possible." Serrat attested that the phrase "victim advised to Prosecutor at earliest" found on Watson's Incident Report confirms that Watson was advised by the police officer that the police would not investigate and that he must go to the prosecutor's office if he wanted to pursue his complaint.
The TMZ Defendants argue that their reporting that Jones was the primary suspect in a police investigation was not knowingly false or reckless because the report states that Moore is the "Primary Investigating Officer," so they did not know that there would be no investigation. However, they provide no explanation for what they thought the phrase "victim advised to Prosecutor at earliest" meant. When asked at her deposition what she thought this phrase meant, McKernan stated, "It meant that the victim was advised to perhaps [sic] a prosecutor soon." When asked whether or not she believed this to mean that Watson had been advised to go and talk to someone else about the case because the police would not investigate, McKernan said, "I don't know." And McKernan could not remember at all what she spoke to Watson about when she talked to him minutes after he left the police station or specifically whether it was possible that he was told to go somewhere else. She also asked him in subsequent emails before the article went out what the police had told him, and he said, "The cops said I did the right thing." She followed up with: "What did they say about investigating it?" Watson replied, "The Austin, Texas cops told me to file here first, then they would go from there. I hope Jerry Jones fineds out," and shortly after, "They said should have went to the FBI. This need hit TV. I'm ready." McKernan testified that she was not sure whether she knew when she was corresponding with Watson if the police were going to investigate at all.
The TMZ Defendants' argument that they cannot be expected to know that the Incident Report did not in fact indicate that the Cleveland police were undertaking an investigation of Jones is undercut by the correspondence and McKernan's testimony. While McKernan testified that she was unsure whether she knew if police were investigating Watson's case, she also testified that she had worked with the Cleveland Police Department's public-information office in the past. McKernan made only one call to the Cleveland Police Department-to the records department-the day before the article was published. She testified that the call to the records department was to confirm that Watson had actually filed the report. After the article was published at 2:45 a.m. Central time on June 18, she made another call to the Cleveland Police Department public-information office at 7:45 a.m. that same morning, and she testified that she is "not sure" why she called the public-information office. However, her correspondence with Bressi that morning after the article was published stated, "I've called Cleveland P.D., asking what it is they are even doing about the report. All I know from records is that it is open and it was only recently filed." At a minimum, viewed in *812 the light most favorable to Jones, the TMZ Defendants have not conclusively rebutted that their actions are not at least prima facie evidence of actual malice.
Having examined the entirety of the evidence, we conclude that Jones has marshaled clear and specific evidence that supports a prima facie case of actual malice, based on "the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication." Dolcefino , 987 S.W.2d at 111-12.
C. Application of Section 73.055
The TMZ Defendants assert that the trial court should have dismissed Jones's defamation claim because Jones failed to satisfy the requirements of the Defamation Mitigation Act (DMA). See generally Tex. Civ. Prac. & Rem. Code §§ 73.051 -.062. The TMZ Defendants argue that the DMA requires dismissal of Jones's defamation claim, based on their contention that Jones did not timely request a correction, clarification, or retraction of the allegedly defamatory statements as required by the Act. See id. § 73.055. Jones responds that he made a demand for correction, clarification, or retraction and that the update posted on TMZ.com after Bressi sent Jones's press release to McKernan was a clarification of the original story, and further, that even if he had made no clarification demand, the TMZ Defendants' remedy was abatement, not dismissal.
The Texas Legislature enacted the DMA in 2013 to "provide a method for a person who has been defamed by a publication or broadcast to mitigate any perceived damage or injury." Id. § 73.052. The only Texas state appellate court to consider the issue has construed the statute to mean that the plaintiff's claim "is not subject to dismissal solely based on the plaintiff's failure to timely and sufficiently request a correction, clarification, or retraction." Hardy v. Communication Workers of Am. Local 6215 AFL-CIO , 536 S.W.3d 38, 48, No. 05-16-00829-CV, 2017 WL 1192800, at *8 (Tex. App.-Dallas Mar. 31, 2017, pet. filed) ; see also itation index="138" url="https://cite.case.law/citations/?q=2017%20WL%201192800">id. at 44 & n.4, 2017 WL 1192800, at *5 & n.4 (explaining that case is one of first impression for Texas state appellate courts and distinguishing nonbinding unpublished Fifth Circuit decision). Similarly to the TMZ Defendants, the defendants in Hardy argued that it was proper for the trial court to dismiss the plaintiff's suit on the ground that there was no evidence that the plaintiff had made a request that complied with Section 73.055, relying on the Section's language providing that a plaintiff "may maintain an action for defamation only if" (1) he timely and sufficiently requested a correction, clarification, or retraction of an allegedly defamatory statement or (2) the defendant made a correction, clarification, or retraction, and arguing that the request is a condition precedent to bringing suit. See id. at 41-42, 2017 WL 1192800, at *2 ; see also Tex. Civ. Prac. & Rem. Code § 73.055.
We agree that when the statute is read in its entirety, giving effect to all its provisions and considering the purpose of the statute, the consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages. See Hardy , 536 S.W.3d at 46-47, 2017 WL 1192800, at *7 (citing Tex. Civ. Prac. & Rem. Code § 73.055(c) ; Neely , 418 S.W.3d at 63 ). In addition, regardless of whether a request is made, if the defendant makes a correction, clarification, or retraction that satisfies the DMA, the plaintiff may not recover exemplary damages unless the publication was made with actual malice. See ids="7252811" index="144" url="https://cite.case.law/sw3d/418/52/#p56">id. (citing Tex. Civ. Prac. & Rem. Code § 73.059 ). These provisions, *813 which affect the damages recoverable by the plaintiff, along with the DMA's provision allowing a defendant to challenge the timeliness and sufficiency of a request for a correction, clarification, or retraction, persuaded our sister court that the Legislature did not intend to deprive a plaintiff of a defamation claim based on a failure to request a correction, clarification, or retraction. Id. The court in Hardy further explained that the DMA's procedure furthers the goals of providing for early resolution of disputes and providing a way for a defamation plaintiff to mitigate damages because it allows both for a presuit request for the defendant to mitigate the harm from allegedly defamatory statements, and if no request is made, for the defendant to move for abatement of the suit until the request is made. Id. ; see also Tex. Civ. Prac. & Rem. Code §§ 73.055(b) (establishing that request made during limitation period for commencement of action is timely), .062 (describing abatement procedure). As the court points out, "if a defendant who did not receive a request for correction, clarification, or retraction could simply seek dismissal of the action, there would be no need for either the limitation of damages or abatement provisions in the statute, and the purpose of the statute would be frustrated." Hardy , 536 S.W.3d at 46, 2017 WL 1192800, at *7 (citations omitted). Accordingly, because the plaintiff's claim was not subject to dismissal based on her failure to timely and sufficiently request a correction, clarification, or retraction, the court determined that the defendants "were not entitled to prevail on a no-evidence motion for summary judgment on a ground that is not an essential element of [the plaintiff's] claim. " Id. at 48, 2017 WL 1192800, at *8 (emphasis added).
We agree with the court's analysis in Hardy , and we conclude that Jones was not required to establish a prima facie case of demand pursuant to Section 73.055 as an essential element of his defamation claim when resisting a TCPA motion to dismiss. The TMZ Defendants assert on appeal that the DMA does not provide an affirmative defense to Jones's defamation claim for which they bear the burden of proving a prima facie case; instead, they rely on their argument that Jones had the burden to show as part of his prima facie case that he satisfied what they describe as a statutory prerequisite to suit. See Tex. Civ. Prac. & Rem. Code § 27.005(d) (allowing movant to establish by preponderance of evidence each essential element of valid defense to nonmovant's claim). Accordingly, we need not reach the parties' arguments about whether Jones made a timely and sufficient request for correction, clarification, or retraction under the DMA or whether the TMZ Defendants issued a clarification. Having determined that Jones established a prima facie case for the essential elements of defamation challenged by the TMZ Defendants and that he was not required to demonstrate that he satisfied the DMA to avoid dismissal, we conclude that Jones established a prima facie case of defamation.
II. Civil conspiracy
Jones also alleged that the TMZ Defendants conspired with Watson to defame him. The TMZ Defendants argue on appeal that Jones's conspiracy claim must be dismissed because it is derivative of his defamation claim. "Civil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, might be called a derivative tort." Tilton v. Marshall , 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding). The tort is derivative because "a defendant's liability for conspiracy depends on participation in some underlying *814 tort for which the plaintiff seeks to hold at least one of the named defendants liable." Id. Consequently, courts "do not analyze the trial court's refusal to dismiss plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action." Id. In other words, if the trial court did not err by refusing to dismiss the defamation claim, then it did not err by refusing to dismiss the conspiracy claim related to the defamation claim. See ids="10019745" index="153" url="https://cite.case.law/sw2d/925/672/#p681">id. Accordingly, we conclude that the trial court did not err by refusing to dismiss Jones's conspiracy claim, which is dependent on his defamation claim.[10]
III. Intentional infliction of emotional distress
The TMZ Defendants also assert that Jones has failed to establish a prima facie case for his claim of intentional infliction of emotional distress. "This tort has four elements: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." Hersh v. Tatum , 526 S.W.3d 462, 468 (Tex. 2017). The Texas Supreme Court has limited the tort of intentional infliction of emotional distress to situations involving an egregious wrong that would otherwise be legally unprotected. Hoffmann-La Roche Inc. v. Zeltwanger , 144 S.W.3d 438, 447 (Tex. 2004) ("In creating the new tort, we never intended that it be used to evade legislatively-imposed limitations on statutory claims or to supplant existing common law remedies."). The court described the tort as "a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." Id. Thus, "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." Id. (citing cases from other jurisdictions disallowing recovery for intentional infliction of emotional distress when factual predicate sounds in defamation); see, e.g. , Provencher v. CVS Pharmacy, Div. of Melville Corp. , 145 F.3d 5, 12 (1st Cir. 1998), abrogated on other grounds by Crowley v. L.L. Bean, Inc. , 303 F.3d 387, 404-07 (1st Cir. 2002). Moreover, the court noted that the plaintiff cannot pursue its intentional-infliction claim regardless of the success or failure of its alternative claim. Hoffmann-La Roche , 144 S.W.3d at 448.
In this case, the facts that Jones bases this claim on are the same facts that he bases his defamation claim on. Jones does not assert that there are any additional, unrelated facts in the record that support his claim for intentional infliction of emotional distress. For this reason, we conclude that Jones did not establish a prima facie case of intentional infliction of emotional distress; therefore, the trial court erred by not dismissing this claim. See Bilbrey , 2015 WL 1120921, at *13-14 (holding that trial court should have dismissed intentional-infliction claim under TCPA because factual basis for claim was same as defamation claim, and plaintiff consequently did not provide "minimum quantum of evidence necessary" to support intentional-infliction claim); Young v. Krantz , 434 S.W.3d 335, 344 (Tex. App.-Dallas 2014, no pet.) (same), disapproved of on other grounds by *815 In re Lipsky , 460 S.W.3d 579 (Tex. 2015). But see Spencer v. Overpeck , No. 04-16-00565-CV, 2017 WL 993093, at *5 (Tex. App.-San Antonio Mar. 15, 2017, pet. denied) (mem. op.) (holding that intentional-infliction claim could proceed in TCPA case even though duplicate remedies might be offered by other claims because argument premature in TCPA context).
IV. Malicious prosecution
The TMZ Defendants challenge the trial court's failure to dismiss Jones's malicious-prosecution claim, arguing that he failed to establish a prima facie case for each element of the claim. To establish a claim for malicious criminal prosecution, Jones needed to show that: (1) a criminal prosecution was commenced against him; (2) the TMZ Defendants initiated or procured that prosecution; (3) the prosecution terminated in Jones's favor; (4) Jones was innocent of the charges; (5) the TMZ Defendants lacked probable cause to initiate the prosecution; (6) the TMZ Defendants acted with malice; and (7) Jones suffered damages. See Kroger Tex. Ltd. P'ship v. Suberu , 216 S.W.3d 788, 793 n.3 (Tex. 2006). In particular, the TMZ Defendants allege that Jones has not established that a criminal prosecution was ever commenced against him. We agree. While "a formal charge by indictment or information against the plaintiff is not a requirement for a malicious-prosecution cause of action," at a minimum, it appears that a criminal prosecution does not commence until a person is arrested or a warrant for his arrest (or some other form of process) is issued. See French v. French , 385 S.W.3d 61, 70 (Tex. App.-Waco 2012, pet. denied) ; see also Restatement (Second) of Torts § 654(2)(c) (1977) ("Criminal proceedings are instituted when (a) process is issued for the purpose of bringing the person accused of a criminal offense before an official or tribunal ... or (b) without the issuance of process an indictment is returned or an information filed against him; or (c) he is lawfully arrested on a criminal charge."). Jones was never arrested, and in fact, he established his prima facie case of actual malice in part with evidence that Watson's report to the police, as memorialized in the Incident Report, resulted in the police advising Watson to consult with the prosecutor and that the police never opened an active investigation into Watson's allegations. We conclude that Jones has not established a prima facie case that a criminal prosecution was commenced against him. Consequently, the trial court erred by denying the TMZ Defendants' motion to dismiss with regard to his malicious-prosecution claim.
V. Abuse of process
The TMZ Defendants contend that Jones failed to establish a prima facie case for his abuse-of-process claim. An abuse-of-process claim "presupposes an originally valid and regular process duly and properly issued." Futerfas v. Park Towers , 707 S.W.2d 149, 160 (Tex. App.-Dallas 1986, writ ref'd n.r.e.). The claim requires "(1) an illegal, improper, or 'perverted' use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal act." Martinez v. English , 267 S.W.3d 521, 528 (Tex. App.-Austin 2008, pet. denied) ; see also Abuse of Process , Black's Law Dictionary (10th ed. 2014) ("The improper and tortious use of a legitimately issued court process to obtain a result that is either unlawful or beyond the process's scope." (emphasis added)). The TMZ Defendants assert that Jones's claim fails because he was never served with process. Jones responds that the Incident Report qualifies as "process" in the broadest *816 sense of the term and argues that filing a false report with the police to generate a story for publicity was perversion of the legal process. See Martin v. Trevino , 578 S.W.2d 763, 769 (Tex. Civ. App.-Corpus Christi 1978, writ ref'd n.r.e.) ("Process has been broadly interpreted to encompass the entire range of procedures incident to litigation." (citing Black's Law Dictionary 1370 (4th Ed. 1951))).
As noted above, criminal proceedings do not commence without at least the issuance of an arrest warrant or a lawful arrest. See French , 385 S.W.3d at 70 ; see also Restatement (Second) of Torts § 654(2)(c) (1977) ; J. C. Penney Co. v. Gilford , 422 S.W.2d 25, 31 (Tex. Civ. App.-Houston [1st Dist.] 1967, writ ref'd n.r.e.) ("While it might be argued on respected authority that procuring the issuance of a warrant of arrest and the subsequent arrest of one for the purpose of extorting the payment of money to the one so procuring the warrant by the one arrested would constitute a sufficient basis for the action of abuse of process, ... we are committed to the view that an action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law." (citations omitted)). We have found no abuse-of-process case, and Jones has not referred us to one, where a valid abuse-of-process claim involved something other than the commencement of the judicial process against the defendant. See, e.g. , RRR Farms, Ltd. v. American Horse Prot. Ass'n, Inc. , 957 S.W.2d 121, 133 (Tex. App.-Houston [14th Dist.] 1997, pet. denied) (finding that because "appellants were not a party to the original action and were not served with process ," they did not satisfy first element of abuse-of-process claim (emphasis added)). In Futerfas , the court held that summary judgment had been properly granted against a plaintiff who had never been arrested or tried in connection with the criminal complaints, explaining that "[i]f [the plaintiff] has not been arrested, then there has been no 'use' of any process (presumably a warrant for his arrest) issued as the result of the filing of the criminal complaints against him." 707 S.W.2d at 160. The dicta in Martin relied on by Jones does not persuade us that we should broaden the traditional notion of an abuse-of-process claim to encompass conduct that occurs before the commencement of some judicial process. See Martin , 578 S.W.2d at 769 ("Texas has generally recognized a cause of action for abuse of process in situations where the original process, such as a writ of garnishment or writ of sequestration, has been abused to accomplish an end other than that which the writ was designed to accomplish."). There is no evidence that Jones was ever arrested as a result of Watson's report, and thus, we conclude that Jones has not established a prima facie case that he was served with process. Therefore, the trial court erred by denying the TMZ Defendants' motion to dismiss with regard to Jones's abuse-of-process claim.
Having concluded that the trial court did not err by denying the TMZ Defendants' motion to dismiss with regard to Jones's defamation and conspiracy claims except as to TMZ.com, we overrule their second issue as it relates to these claims. Having concluded that the trial court erred by denying the TMZ Defendants' motion to dismiss with regard to Jones's claims for intentional infliction of emotional distress, malicious prosecution, and abuse of process against all defendants and his claims for defamation and conspiracy against TMZ.com, we sustain their second issue as it relates to these claims.
Did the trial court err by considering the evidence challenged by the TMZ Defendants?
In their third issue, the TMZ Defendants argue that the trial court erred *817 by considering inadmissible evidence to which they had properly objected. They further argue that because the trial court did not explain its decision or issue findings of fact and conclusions of law, we should remand the case for reconsideration of the motion to dismiss because we cannot assess whether the trial court's decision might have been different if it had considered this allegedly inadmissible evidence. Jones responds that the TMZ Defendants (1) have not shown that the trial court abused its discretion by admitting the challenged evidence and (2) have not demonstrated that any of the challenged statements rises to the level of harmful error.
Our disposition of the issues on appeal does not turn on any of the affidavits that the TMZ Defendants objected to. Although when analyzing actual malice we considered portions of the affidavit of Serrat, Jones's expert witness, that evidence is cumulative of other evidence related to the TMZ Defendants' stated uncertainty about whether the police were investigating. Gee v. Liberty Mut. Fire Ins. Co. , 765 S.W.2d 394, 396 (Tex. 1989) (explaining that courts "will ordinarily not find reversible error for erroneous rulings on admissibility of evidence where the evidence in question is cumulative and not controlling on a material issue dispositive of the case"). Serrat's testimony was not dispositive of our decision on actual malice. Nevertheless, we will analyze whether the trial court abused its discretion by admitting those portions of Serrat's affidavit. See Southwestern Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 716-17 (Tex. 2016) ("The trial court's ruling on the admission of expert evidence is reviewed for abuse of discretion."). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. See Owens-Corning Fiberglas Corp. v. Malone , 972 S.W.2d 35, 43 (Tex. 1998).
"An expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified, the expert's opinion is relevant, the opinion is reliable, and the opinion is based on a reliable foundation." Whirlpool Corp. v. Camacho , 298 S.W.3d 631, 637 (Tex. 2009). The TMZ Defendants' only objection to Serrat's qualifications in the trial court was that some of his testimony about the terminology used in the Incident Report "amounts to an unsupported expert opinion for which no foundation was laid and which Mr. Serrat has no apparent qualifications to provide." On appeal, their complaint is that he has never been a police officer and that his testimony is essentially "that the police report does not mean what it says" and is therefore unreliable and speculative. Serrat's affidavit testimony makes clear that his opinion about the Cleveland Police Department's procedure for handling the Incident Report and the meaning of the terms used on the report is based on his experience as a criminal-defense attorney practicing for over thirty-one years in the Cleveland, Ohio area. He has provided legal representation in thousands of criminal cases and interacts on a regular basis with the City of Cleveland Police Department. He testified that he is "very familiar based upon my education, training and experience, with the processes and procedures that take place before, during, and after the generation of an incident report like the one attached hereto as Exhibit C." We conclude the trial court did not abuse its discretion by determining that this experience qualifies Serrat as an expert and provides a reliable foundation for his opinions. We need not reach the TMZ Defendants' complaints about the admission of the other affidavits because the objected-to evidence was not material to our disposition of the appeal. See Tex. R. App. P. 47.1. We overrule the TMZ Defendants' third issue.
*818 CONCLUSION
We reverse that portion of the trial court's order denying the TMZ Defendants' motion to dismiss Jones's claims for defamation and conspiracy only against TMZ.com and Jones's claims for intentional infliction of emotional distress, malicious prosecution, and abuse of process, and we render judgment dismissing these claims with prejudice. We affirm that portion of the trial court's order denying the TMZ Defendants' motion to dismiss Jones's claims for defamation and conspiracy against all appellants other than TMZ.com. We remand the case to the trial court for further proceedings consistent with this opinion, including consideration of the defamation and conspiracy claims and determination of the attorneys' fees and sanctions that must be awarded under Section 27.009 in connection with the dismissal of the other claims. See Sullivan v. Abraham , 488 S.W.3d 294, 299 (Tex. 2016) ; Serafine v. Blunt , No. 03-16-00131-CV, 2017 WL 2224528, at *7 (Tex. App.-Austin May 19, 2017, pet. denied) (mem. op.) (remanding for determination of reasonable, i.e., "fair and moderate," attorneys' fees and sanctions in an amount less than zero, but noting trial court's broad discretion to determine appropriate sanctions).

There are three different time zones involved in this case. Jones lives in Austin, Texas; defendant McKernan worked in Los Angeles, California; and at the time of the relevant events, Watson lived in Cleveland, Ohio. For convenience, all references to times have been converted to Central Daylight Time (CDT).

We refer to the article, the update, and the Twitter post collectively as the "article," the "story," or the "news story."

All quotations from the record are accurately transcribed. All mistakes have been left as found in the original documents, but for ease of reading, they are not identified with "[sic]."

A " 'legal action' means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." Tex. Civ. Prac. & Rem. Code § 27.001(6).

The TMZ Defendants alternatively argue that the TCPA applies because (1) Jones's claims are related to their exercise of the right of free speech because Jones is a public figure and because the article concerned the government and related to community well-being and (2) Jones's claims are related to their exercise of the right to petition. See Tex. Civ. Prac. & Rem. Code § 27.001(3), (4)(B), (7)(B), (C), (D). We need not reach these arguments because we hold that, on this record, Jones's claims related to the TMZ Defendants' exercise of the right of free speech because the statements are related to "health or safety." See id. § 27.001(7)(A). Accordingly, we express no opinion on whether Jones is a public figure for this purpose, whether the article related to the government or to community well-being, or whether Jones's claims are related to the TMZ Defendants' exercise of the right to petition.

While we conclude that Jones has established a prima facie case that Warner Bros. Entertainment, Inc. and TMZ Productions, Inc. published the article, we express no opinion on the ultimate merits of his claim as to the corporate defendants. We merely conclude that at this early stage of the case, the corporate defendants have not conclusively rebutted the prima facie case established by Jones.

Jones also argued on appeal that the TMZ Defendants' denial that they published the statements at issue precludes their ability to obtain dismissal under the TCPA. We note that the Texas Supreme Court recently rejected this theory. See Hersh v. Tatum , 526 S.W.3d 462, 467 (Tex. 2017) (holding that because basis of a legal action is determined by plaintiff's allegations, not defendant's admissions or denials, defendant who denies making communication may still move for dismissal under TCPA).

As noted previously, the TMZ Defendants assert that Jones is a public figure. If the trial court concludes that Jones is a public figure, he will be required to show at trial that the TMZ Defendants acted with actual malice regarding the truth of the challenged statements, rather than with negligence. See Neely v. Wilson , 418 S.W.3d 52, 61 (Tex. 2013) (identifying elements of defamation claim). We assume without deciding that Jones is a public figure for purposes of our actual-malice analysis at this preliminary stage of the case, but we express no opinion on whether Jones is a public figure for the purpose of the trial on the merits.

At her deposition, McKernan testified that she could not remember whether she had done anything to investigate Watson, including whether she had asked him what he did for a living, whether she had asked him if he ever had any criminal problems, or whether she had Googled his name. She further testified that she did not recall or know of anyone else at TMZ investigating Watson or his background. Later in her deposition, she testified that "[j]ail records are sometimes public record" and that she might have looked up whether Jones was in jail before the article was published.

Because we determined that the trial court erred by refusing to dismiss Jones's defamation claim against the domain name TMZ.com, the trial court likewise erred by refusing to dismiss Jones's conspiracy claim against the domain name TMZ.com, which was dependent on the defamation claim.