COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| AARON WHITELOCK and DONNA WHITELOCK, | § | No. 08-21-00185-CV |
| | § | Appeal from the |
| Appellants, | | |
| | § | 13th Judicial District Court |
| v. | | |
| | § | of Navarro County, Texas |
| JENNIFER STEWART, DONALD STEWART, STEVEN STEWART, and KATHY STEWART, and d/b/a ROYAL HORSE FARMS, | § | (TC# D21-29799-CV) |
| | § | |
| Appellees. | § | |

## O P I N I O N

Appellants Aaron Whitelock and Donna Whitelock (the Whitelocks) appeal from the trial court's order denying their Texas Citizens Participation Act (TCPA) motion to dismiss the petition filed by Appellees Jennifer Stewart, Donald Stewart, Steven Stewart, and Kathy Stewart, and d/b/a Royal Horse Farms (collectively, the Stewarts) accusing the Whitelocks of defamation, intentional infliction of emotional distress, civil conspiracy, aiding and abetting, and ratification. The Whitelocks argue that the Stewarts did not meet their burden of establishing a prima facie case with respect to any of their claims, that their claims were barred by res judicata and collateral estoppel, and that the statute of limitations ran on the defamation claim. The Whitelocks further argue that the trial court erred by granting the Stewarts' motion for a new trial, contending it was

untimely filed and the trial court had no valid basis for granting the motion. For the reasons set forth below, we affirm the trial court's judgment.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties' Prior Dealings

Donald and Kathy Stewart own Royal Horse Farms (RHF), a family-run horse farm in Navarro County that breeds, raises, competes, and boards horses. Their daughter, Jennifer Stewart, is primarily responsible for operating the farm, along with her brother, Steven Stewart, who also owns a horse supplement company. Donna Whitelock and her son, Aaron Whitelock, similarly own and operate a horse farm in the same area and had regular business dealings with the Stewarts.

In the summer of 2019, the Stewarts and Whitelocks became embroiled in a dispute over a debt the Stewarts claimed the Whitelocks owed RHF for the purchase of a stallion and the leasing of a brood mare as well as over the ownership of the brood mare's foals. According to the Stewarts, Donna Whitelock threatened to "ruin" their business if they did not give her the stallion and foals.

Within the same time period, Aaron Whitelock retrieved two of his horses from RHF, including a mare named Navarra that was approximately 27 years old and a filly that had been born there. According to Aaron, when he picked them up, the horses—and Navarra in particular—appeared to be malnourished and neglected. Aaron consulted with a veterinarian, who reported that the filly was two to three hundred pounds underweight, had a severe parasite load, and suffered from malnutrition and lack of exercise. The veterinarian reported that Navarra was 400 pounds underweight, emaciated, heavily invested with parasites, and in need of deworming, hoof care, and dental care. Aaron concluded that the condition of both horses was attributable to the lack of an appropriate diet and the lack of veterinary care while at RHF.

---

[1] This case was transferred from our sister court in Waco, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

**B.      Jennifer Stewart's Arrest**

Shortly thereafter, Donna Whitelock filed a report with the Navarro County Sheriff's Office, complaining that Jennifer Stewart, who she identified as the owner of RHF, was "not taking care of her horses"; that one of her horses had lost 500 pounds while in Jennifer's care; and that she had seen "a lot of poor horses in need of food on the ranch and one dead [foal] that had rotted away to bones laying on top of the ground." She further reported that Jennifer kept the "poor horses hidden on the back side of her ranches." And finally, she claimed that Jennifer had "been in trouble before for in Florida for animal cruelty." According to the sheriff's incident report, deputies went to RHF on multiple occasions but never saw any starving horses or other signs of animal cruelty. Despite the incident report, Jennifer Stewart was arrested on August 8, 2019, on two charges of "cruelty to livestock animals." She was released the next day. At least one newspaper published a story about her arrest, with the title, "Well-Known Corsicana Horse Breeder Arrested: Sheriff."

**C.      The Social Media Statements**

In late June of 2019, Aaron Whitelock began making comments on his personal Facebook page regarding the condition of his horses and accused Jennifer Stewart and RHF of starving and neglecting his and other horses in their care. The Stewarts claim that in July of 2019, the Whitelocks created a Facebook group titled, "Royal Horse Farms Revealed," which had the stated purpose of providing "official news and information about the ongoing Royal Horse Farms investigation (or at least as much that can be shared)."[2] According to the Stewarts, this page contained similar statements accusing RHF of starving and neglecting horses as well as information about Jennifer Stewart's arrest. It further contained photos the Whitelocks represented

---

[2] In his declaration, Aaron Whitelock denied creating the page, but acknowledged that he was a member of the group, whose purpose, he stated, was rescuing horses from Royal Horse Farms.

were photos of their horses in an emaciated condition after Aaron Whitelock picked them up from RHF and a booking photograph from Jennifer Stewart's arrest.

The Stewarts contend the Whitelocks also created a Facebook page titled "We Are IALHA" on which they accused Jennifer Stewart, the then vice president of the IALHA (International Andalusian and Lusitano Horse Association)—a well-known association in the horse-breeding industry, of abusing horses and committing fraudulent acts in role in the association. And, the Stewarts contend that the creators and administrators of the page, which they believed included Aaron Whitelock, invited others to join the page, including individuals active in the "Andalusian Equine Community" in general, board members of IAHLA, and judges of equine competitions.-The Stewarts also claim Aaron Whitelock spearheaded a referendum campaign to remove Jennifer from her vice-president position based on the same allegations.

The Whitelocks acknowledge the controversy surrounding the animal-cruelty accusations garnered national attention, and individuals from across the country commented on the situation on social media. The Stewarts claim that the Whitelocks themselves reposted their accusations hundreds of times, and that in turn, third parties reposted thousands of times on various social media sites.

## D.    The Current Lawsuit

Initially, the Stewarts sent Aaron Whitelock a letter listing several statements they believed the Whitelocks had posted on social media sites that were false and defamatory and requested that he correct, clarify, or retract the statements. It appears that the letter was returned to the Stewarts with hand-written comments to the effect that the statements were true and that the matter could be settled in court. As explained below, the Stewarts thereafter filed two lawsuits against the Whitelocks in a Navarro County statutory county court with respect to the allegedly defamatory

4

statements, one of which resulted in a nonsuit and the second of which resulted in a default judgment in favor of the Stewarts on liability.

On September 14, 2020, the Stewarts filed their current lawsuit in the Navarro County District Court against the Whitelocks and other named defendants (who had allegedly reposted the challenged statements on social media or posted their own comments accusing the Stewarts of animal cruelty), bringing claims of defamation, intentional infliction of emotional distress (IIED), civil conspiracy, aiding and abetting, and ratification. The Whitelocks denied the Stewarts' claims and raised two affirmative defenses: (1) that the one-year statute of limitations had run on the Stewarts' defamation claim; and (2) that the Stewarts' claims were barred by res judicata and collateral estoppel based on the default judgment they had previously received in the statutory county court case. The Whitelocks then filed a timely motion to dismiss all of the Stewarts' claims pursuant to the TCPA, alleging that the Stewarts' lawsuit was based on or in response to their exercise of free speech on a matter of public concern; that the Stewarts could not meet their burden of establishing a prima facie case on their various causes of action; and that their affirmative defenses barred the Stewarts from bringing the claims.

The Stewarts responded to the TCPA motion with various declarations and evidence in support of their claims, but the trial court sustained multiple objections to most, if not all, of their evidence and granted the Whitelocks' motion to dismiss, stating only that it was dismissing the claims under the TCPA. The trial court thereafter granted the Whitelocks' request for attorney fees and costs and sanctioned the Stewarts. The parties agree that the trial court's order granting the Whitelocks' TCPA dismissal motion became final on June 16, 2021, when the trial court severed the case against the Whitelocks from the remaining defendants.

5

## E.    The Motion for New Trial

The Stewarts then filed a motion for new trial alleging, among other things, that the Stewarts had discovered new evidence from Raechel Rohach, one of the defendants who had previously been dismissed from the lawsuit, as well as from Raechel's husband, Stefan Rohach. The Rohaches claimed the Whitelocks had made false statements in their declarations.[3] In addition, Raechel Rohach averred that Donna Whitelock admitted that she had threatened the Stewarts with "burning down" their farm. Although the Whitelocks argued that the motion lacked merit and was not timely filed, as discussed below, following an unrecorded hearing, the trial court granted the motion. The court issued an order stating that it was vacating its prior order dismissing the Stewarts' claims as well as its prior order striking their evidence. The order also denied the Whitelocks' TCPA motion to dismiss This appeal followed.

## II.   ISSUES PRESENTED

Although the Whitelocks list eight issues in their brief, we consolidate them into four main categories. First, we will consider Issues One, Two, and Eight, regarding whether the trial court erred in granting the Stewarts' motion for new trial and in vacating its prior order sustaining the Whitelocks' objection to the Stewarts' TCPA evidence. The remaining issues, which overlap with each other, are broken into the following categories: (1) whether the Whitelocks met their burden of establishing that the TCPA applied to the Stewarts' defamation claim, whether the commercial exception to the TCPA applied to that claim, whether the Stewarts met their burden of establishing a prima facie case of defamation, and whether the Whitelocks' affirmative defenses barred the defamation claim; (2) whether the Stewarts' IIED claim contained allegations that were independent of their defamation claim and that cannot be considered protected speech under the

---

[3] In particular, the Rohaches claimed that Aaron Whitelock falsely denied that he was involved in the referendum to remove Jennifer Stewart as the IALHA vice-president, and that Donna Whitelock falsely denied that she had been in contact with one of the other defendants in the case with whom she was accused of conspiring.

TCPA; and (3) whether the Stewarts' remaining claims for civil conspiracy, aiding and abetting, and ratification were derivative claims for which a TCPA analysis was unnecessary.

### III. GRANTING THE MOTION FOR NEW TRIAL

We start with the three issues regarding whether the trial court erred in granting the Stewarts' motion for new trial and in vacating its prior order sustaining the Whitelocks' objections to the Stewarts' evidence that they filed in response to the TCPA motion. We find all three issues to be without merit.

### A.      Applicable Law

When an order is wholly void, "an order granting a motion for new trial rendered within the period of the trial court's plenary power is not reviewable on appeal." *See Wilkins v. Methodist Health Care System*, 160 S.W.3d 559, 563 (Tex. 2005); *see also Shrewsbury v. Por*, No. 08-13-00364-CV, 2015 WL 3898801, at *1 (Tex. App.—El Paso June 24, 2015, no pet.) (mem. op.). As the Texas Supreme Court has explained, "[w]hen a motion for new trial is granted, 'the case shall be reinstated upon the docket of the trial court and stand for trial the same as though no trial had been had.'" *Wilkins*, 160 S.W.3d at 563 (citing *Wichita Falls Traction Co. v. Cook*, 60 S.W.2d 764, 768 (Tex. [Comm'n Op.] 1933)). "Thus, when the trial court grants a motion for new trial, the court essentially wipes the slate clean and starts over." *Id.*

### B.      Analysis

In Issue One, the Whitelocks contend the Stewarts did not timely file their motion for new trial and that the trial court therefore lost plenary power, thereby making the order void and subject to reversal on appeal. We disagree.

The Whitelocks correctly point out that the Stewarts had thirty days to file their motion for new trial. *See* TEX. R. CIV. P. 329b(a) ("A motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is signed."). And the parties

agree that the trial court's order denying the Whitelocks' TCPA motion became final when the trial court entered its order on June 16, 2021 severing the Whitelocks' case from the case against the other defendants. Accordingly, the Stewarts had until July 16, 2021 to file their motion for new trial.

The record reflects that the Stewarts submitted their motion for filing through the court's e-filing system on Friday, July 16, 2021, at 5:35 p.m. However, as documented in a certified copy of the "envelope details," the clerk's office notified the Stewarts that the motion had been rejected on Monday, July 19, 2021, at 8:15 a.m., for the following reasons: "PDF documents combined- Please separate Lead Documents." The clerk further stated in its rejection notice: "Please Resubmit as separate Lead Documents." On July 23, 2021, the Stewarts resubmitted their motion and supporting documents, and the motion was accepted for filing by the clerk that same day.[4] The Whitelocks, however, contend that because the clerk did not initially accept the Stewarts' motion for new trial on July 16, 2021, the day of the filing deadline, and because the Stewarts waited until July 23 to resubmit their filing, we should conclude that the motion was not timely filed and that the trial court therefore lost plenary jurisdiction to hear it. We disagree.

The e-filing rules in Texas provide that "a document is considered timely filed if it is electronically filed at any time before midnight (in the court's time zone) on the filing deadline." TEX. R. CIV. P. 21(f)(5). The rules further provide that an "electronically filed document is deemed

---

[4] The Whitelocks also contend that the Stewarts failed to timely submit their filing fee along with their initial filing, but this does not appear to be the reason that the clerk rejected the filing. In any event, the failure to timely pay a filing fee does not deprive a trial court of jurisdiction to hear a motion for new trial; instead, the motion will be considered "conditionally filed" when submitted without payment and will be deemed filed on the day it was tendered to the clerk. *See NA Land Co. v. State*, 624 S.W.3d 671, 674 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (recognizing that "courts have routinely held a document is 'filed' when it is tendered to the clerk although a filing fee is not paid until a later date.") (citing *Jamar v. Patterson*, 868 S.W.2d 318, 319 (Tex. 1993)); *see also In re Lewis*, 185 S.W.3d 615, 617 (Tex. App.—Waco 2006, no pet.) (recognizing that if a motion for new trial is tendered to the clerk without the filing fee, the motion is "conditionally filed," and the motion is deemed filed on the day it was tendered to the clerk for appellate timetable purposes).

filed when transmitted to the filing party's electronic filing service provider." *Id.*; *see also NA Land Co.*, 624 S.W.3d at 674 (recognizing that a motion for new trial is filed at the time the motion is "transmitted the document to the electronic filing service provider" for purposes of establishing the appellate timetable); *Nevarez Law Firm, P.C. v. Inv. Land Servs., L.L.C.*, 610 S.W.3d 567, 570 (Tex. App.—El Paso 2020, no pet.) (op. on reh'g) (recognizing same).

The trial court was without authority to reject the filing, as Rule 21(f)(11) expressly provides that a "clerk may not refuse to file a document that fails to conform with this rule." TEX. R. CIV. P. 21(f)(11). Instead, under Rule 21(f)(11), the clerk was to "identify the error to be corrected and state a deadline for the party to resubmit the document in a conforming format." *Id.*; *see also Nevarez Law Firm, P.C.* , 610 S.W.3d at 570. Here, while the clerk incorrectly rejected the filing due to formatting issues and failed to provide a deadline for resubmission, the Stewarts resubmitted the motion in the correct format within a reasonable time. We therefore conclude that the Stewarts' motion for new trial was timely filed. *See Nevarez Law Firm, P.C.,* 610 S.W.3d at 570-71 (party's motion for new trial was timely filed where it was transmitted to the electronic filing service provider prior to the filing deadline but was wrongfully rejected by the clerk's office, and later resubmitted in accordance with the clerk's instructions); *see also In re Barr*, No. 05-19-00511-CV, 2019 WL 2082468, at *2 (Tex. App.—Dallas May 13, 2019, no pet.) (mem. op.) (citing *Warner v. Glass*, 135 S.W.3d 681, 684 (Tex. 2004) ("Once a party has satisfied his duty to put a legal instrument in the custody and the control of the court clerk, he should not be penalized for errors made by the court clerk.").

The Whitelocks concede that, assuming the motion for new trial was timely filed, the trial court issued its ruling while it still had plenary power over the case. And because we have no authority to review the merits of its order under these circumstances, we do not reach the Whitelocks' argument that the trial court abused its discretion in granting the motion. *See Wilkins*,

9

160 S.W.3d at 563. Similarly, we do not reach the Whitelocks' argument that the trial court erred by vacating its prior order sustaining their objection to the Stewarts' TCPA evidence because when the trial court granted the motion for new trial, it "wiped the slate clean" and the proceedings began anew. *Id.*

Accordingly, the Whitelocks' Issues One, Two, and Eight are overruled.

## IV.  OVERVIEW OF THE TCPA

We next turn to the Whitelocks' argument that the trial court erred in denying their motion to dismiss under the TCPA, which encompasses their remaining issues.

Enacted to protect citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern, the TCPA permits a defendant to move to dismiss a lawsuit on the ground that the "legal action is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a); *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015). The TCPA states that the "[e]xercise of the right of free speech" means a communication "made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3); *In re Lipsky*, 460 S.W.3d at 586; *see also Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam).

The TCPA provides a three-step burden-shifting procedure for determining whether a lawsuit should be dismissed under the TCPA. First, the defendant/movant shoulders the initial burden of demonstrating that the legal action "is based on, relates to, or is in response to" his exercise of the right of free speech, the right to associate, or the right to petition, and that the exercise was made in connection with a matter of public concern. *In re Lipsky*, 460 S.W.3d at 586; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1)(A)–(C). If the defendant meets this initial hurdle, the burden then shifts to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim [or claims] in question." *Id*. (citing

10

TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). And if the plaintiff meets this burden, the burden shifts "back to the [defendant] to prove each essential element of any valid defenses by a preponderance of the evidence." *Youngkin v. Hines*, 546 S.W.3d 675, 679–80 (Tex. 2018); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

An appellate court reviews a trial court's ruling on a TCPA motion to dismiss de novo, and in particular, for whether the parties each met their respective burdens under the Act. *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019). On review, we consider all pleadings in the record, including all supporting and opposing affidavits stating the facts upon which the liability or defense is based. *See Clinical Pathology Labs., Inc. v. Polo*, 632 S.W.3d 35, 43 (Tex. App.—El Paso 2020, pet. denied) (citing *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019)); TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a)). We view the pleadings and evidence in the light most favorable to the non-movant in determining whether dismissal is warranted. *Polo*, 632 S.W.3d at 43 (citing *Pacheco v. Rodriguez*, 600 S.W.3d 401, 405 (Tex. App.—El Paso 2020, no pet.)). In conducting our review, we also keep in mind that the TCPA's "purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *Id.* at 42 (citing *In re Lipsky*, 460 S.W.3d at 589; TEX. CIV. PRAC. & REM. CODE ANN. § 27.002).

We analyze each of the Stewarts' claims separately to determine whether the TCPA mandated their dismissal.

## V. THE STEWARTS' DEFAMATION CLAIM

Below, we analyze the Stewarts' defamation claim and whether the parties have met their burdens under each step of the TCPA.

11

**A.    Step One: Whether the TCPA Applies to the Stewarts' Defamation Claim**

**_1.    The Challenged Statements were Communications on Matters of Public Concern_**

We begin with the threshold question of whether the TCPA applies to the Stewarts' defamation claim. As a preliminary matter, we agree with the Whitelocks that the comments they allegedly posted on the various social media sites identified in the Stewarts' pleadings, as well as Donna Whitelock's report to the police, were "communications" within the meaning of the TCPA. _See generally Bedford v. Spassoff_, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam) (applying TCPA to defamation claim relating to comments made on Facebook); _Buckingham Senior Living Cmty., Inc. v. Washington_, 605 S.W.3d 800, 807 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (recognizing that when a "person interacts with the police to report perceived wrongdoing, that person is exercising their right to petition, as that right is defined in the TCPA"). We also agree with the Whitelocks that the communications were made in connection with a "matter of public concern," as required by the Act.[5] _See Hersh v. Tatum_, 526 S.W.3d 462, 467–68 (Tex. 2017) (discussing requirement that the TCPA only applies to statements that are a "matter of public concern").

The TCPA provides that a "'[m]atter of public concern' means a statement or activity regarding . . . a matter of political, social, or other interest to the community; or . . . a subject of concern to the public." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001 (7)(B), (C). As several of our sisters courts have recognized, communications about animal abuse can be considered of concern to the public or of interest to the community. _See Duncan v. Acius Group, LP_, No. 05-18-

---

[5] The Stewarts do not address this issue on appeal, but in the trial court, they argued that the Whitelocks' communications were not made in connection with a matter of public concern and that they instead related to a "private dispute" between the two families, i.e., their contractual dispute over the ownership of the horses and the debts that the Whitelocks allegedly owed them. But as the Whitelocks pointed out, while the parties did have an ongoing contractual dispute, the challenged statements did not relate to that dispute.

01432-CV, 2019 WL 4392507, at *3 (Tex. App.—Dallas Sept. 13, 2019, no pet.) (mem. op.) (to the extent that "appellees' defamation claims regarding communications alleging animal abuse and killing," such statements were matters of public concern); *Maldonado v. Franklin*, No. 04-18-00819-CV, 2019 WL 4739438, at *7 (Tex. App.—San Antonio Sept. 30, 2019, no pet.) (mem. op.), *abrogated on other grounds by Montelongo v. Abrea*, 622 S.W.3d 290 (Tex. 2021) (plaintiff's verbal complaints to Animal Control Services and online posts on community forums about the defendant's' alleged criminal mistreatment of their dog were communications made "in connection with" an "issue related to" a matter of public concern—animal welfare."); *Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at *10 (Tex. App.—Fort Worth Apr. 9, 2015, pet. denied) (mem. op.) (per curiam) ("[W]e agree that allegations of animal cruelty can be a matter of public concern . . . ."). And in general, accusing someone of engaging in a criminal offense (including animal cruelty) or of being under criminal investigation for such an offense is a matter of public concern under the TCPA. *See Beard v. McGregor Bancshares, Inc.*, No. 05-21-00478-CV, 2022 WL 1076176, at *6 (Tex. App.—Dallas Apr. 11, 2022, pet. denied) (mem. op.) (recognizing that "TCPA case law is clear that criminal acts are matters of public concern" and that "killing animals" is a criminal act); *see also Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *3–4 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (plaintiff's allegation that he was under criminal investigation was a statement regarding a matter of interest to the community and regarding a subject of concern to the public). We therefore conclude that the statements the Whitelocks allegedly made accusing the Stewarts of animal abuse and of being the subject of criminal investigations for animal cruelty in both Navarro County and Florida were related to matters of public concern within the meaning of the TCPA.[6]

---

[6] In their brief, the Stewarts state in a footnote that they wish to "reserve their right to argue that the TCPA does not apply because the Appellants' defamatory statements created the very public concern upon which they relate," i.e., the controversy over their alleged animal abuse, and that the Whitelocks therefore cannot establish that their

We also conclude that the statements the Whitelocks allegedly made accusing Jennifer Stewart of fraudulent acts in her capacity as vice-president of the IALHA also related to matters of public concern. In general, courts have held that communications accusing an individual of fraudulent activity can be considered a matter of public concern for purposes of the TCPA. *See D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 441 (Tex. 2017) (treating communications accusing plaintiff of welfare fraud as constituting a matter of public concern for purposes of the TCPA); *Nguyen v. Trinh*, No. 14-21-00110-CV, 2022 WL 805820, at *4 n.1 (Tex. App.—Houston [14th Dist.] Mar. 17, 2022, no pet.) (mem. op.) (treating communications accusing the plaintiff of immigration fraud and tax evasion as being matters of public concern under the TCPA); *Deaver v. Desai*, 483 S.W.3d 668, 673-74 (Tex. App.—Houston [14th Dist.] Dec. 3, 2015, no pet.) (website claiming that attorneys engaged in fraudulent activities related to matters of public concern); *AOL, Inc. v. Malouf*, Nos. 05-13-01637-CV, 05-14-00568-CV, 2015 WL 1535669, at *2 (Tex. App.—Dallas Apr. 2, 2015, no pet.) (mem. op.) (article that communicated that a dentist had been charged with "defrauding state taxpayers of tens of millions of dollars in a Medicaid scam" related to a matter of public concern). In addition, as the Stewarts pointed out, some of the Whitelocks' accusations could be construed as accusing Jennifer of criminal conduct, such as the accusation that she tampered with the organization's computer system to avoid prosecution and that she used her IALHA board position to improperly further her own interests and the interests of third parties. *See Rosenthal*, 529 S.W.3d at 439–40) (recognizing that an article accusing the plaintiff of committing welfare fraud "could reasonably be construed to accuse [her] of committing a crime"). And as explained above, accusations that a person engaged in criminal

communications were made in connection with a matter of public concern as contemplated by the TCPA. We note, however, that regardless of whether the Stewarts may "reserve" an appellate argument for our consideration, any such argument would fail, as the TCPA is not concerned with who started a particular controversy, but whether any communications made with respect to that controversy were "made in connection with a matter of public concern." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3); *In re Lipsky*, 460 S.W.3d at 593.

conduct is considered a matter of public interest under the TCPA. Notably, the record reflects that the IALHA is a nonprofit international organization whose members compete in horse shows around the world, and therefore, the allegations that Jennifer Stewart had committed fraud, if not criminal activity, in her role as the IALHA's vice-president was clearly of interest to this particular community. *See generally Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018) (recognizing that in the context of a small residential community, "any allegation of malfeasance and criminality by the developer and the HOA likely concerns the well-being of the community as a whole," and can be considered a matter of public concern under the TCPA).

Accordingly, we conclude that the Whitelocks met their initial burden of establishing that the challenged statements arose from the exercise of their free speech and were related to a matter of public concern.

### 2. The Commercial Speech Exception to the TCPA does not Apply

The commercial speech exception to the TCPA provides that:

> [t]his chapter does not apply to . . . a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(a)(2). The Texas Supreme Court has stated that it construes the commercial-speech exemption to apply when:

> (1) the defendant was primarily engaged in the business of selling or leasing goods, (2) the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services, (3) the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides, and (4) the intended audience of the statement or conduct w[as] actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018).

In the trial court, the Stewarts argued that this exception applied to the Whitelocks' communications and that the Whitelocks' comments were therefore not protected under the TCPA. In particular, they argued that both the Whitelocks and the Stewarts were "primarily engaged in the equine business"; that the "Whitelocks made the actionable statements in their capacity as breeders in the equine business"; that the "statements arose out of their transactions with the Stewarts through Royal Horse Farm"; and that their "intended audience was the parties' potential and actual customers for the equine business in which they both engage."

The Stewarts presented no evidence that they were in the business of selling and leasing goods. More importantly, the Whitelocks' alleged comments were not made with respect to any commercial transaction involving the sale or leasing of goods. While the parties may have had an earlier dispute over the sale or leasing of horses, the Whitelocks' allegedly defamatory comments did not relate to that dispute and instead related to whether the Stewarts committed acts of animal cruelty and whether Jennifer Stewart committed fraudulent acts in her role as vice-president of the IALHA. Accordingly, the TCPA's commercial exception does not apply to the Stewarts' defamation claim. *See, e.g.*, *Deaver v. Desai*, 483 S.W.3d 668, 673–74 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (commercial speech exception did not apply where the plaintiff failed to demonstrate that the defendant was "primarily engaged in the business of selling or leasing goods or services," or that the statements on his website arose out of any such services); *Castleman*, 546 S.W.3d at 690 (the TCPA's commercial exemption did not apply even though the defendant was primarily engaged in the business of selling goods, but where his "allegedly defamatory statements did not arise out of his sale of goods or services or his status as a seller of those goods and services").

Accordingly, the Whitelocks' Issues Three and Four are sustained.

16

**B.     Step Two: The Prima Facie Case**

We next turn to the second step in our TCPA analysis and the Whitelocks' argument that the Stewarts did not present clear and convincing evidence to support a prima facie case as to each element of their defamation claim. We disagree with this argument.

*1. Applicable Law and Standard of Review*

To establish a prima facie case of defamation, the plaintiff must present clear and convincing evidence of each of the following elements: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *Rosenthal*, 529 S.W.3d at 434 (citing *Lipsky*, 460 S.W.3d at 593; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). In a defamation case, the threshold question is whether the words used "are reasonably capable of a defamatory meaning." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)). This is an objective rather than a subjective examination. *Id*. Thus, "if a statement is not verifiable as false, it is not defamatory." *Id.* (citing *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013)). "Similarly, even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as a fact." *Id*. (citing *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)).

The question of whether a statement crosses the line between fact and opinion is a question of law that we review de novo. *See Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex. App.—Dallas 2006, no pet.). We construe a statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire

statement." *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 202 (Tex. App.—El Paso, 2017, no pet.) (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)).

### 2. *The Defamatory Nature of the Statements*

In their First Amended Petition, the Stewarts list hundreds of statements that the Whitelocks (and others) allegedly made on social media posts regarding two broad categories: (1) statements accusing them of animal abuse and cruelty in Navarro County and Florida; and (2) statements accusing Jennifer Stewart of fraud and potentially criminal conduct in her role as vice-president of the IALHA. The Whitelocks contend that these statements were not actionable as defamation because they were no more than "hyperbolic opinion" statements rather than objectively or verifiably false statements of fact, given the context in which they were made. We disagree.

As a preliminary matter, we recognize that at least some of the statements that the Stewarts have identified in their pleadings were, standing alone, the Whitelocks' opinions about the Stewarts' character and may not have been objectively verifiable, such as the statement that the Stewarts were "total idiots," and that they were "nothing but liars and a bunch of frauds." Also, generally calling someone a "horse abuser," standing alone, might simply be interpreted as being the type of "'loose, figurative or hyperbolic' language that is immunized from defamation claims." *See Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *15 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (mem. op.) (recognizing that calling someone a "sex predator," which does not have an "objective, verifiable meaning," as opposed to making a statement that someone was a "convicted felon," which is in fact a verifiable statement, "is the sort of 'loose, figurative or hyperbolic' language that is immunized from defamation claims"). *Id.* at *16.

Notwithstanding that category of statements, we conclude, as a matter of law, that the Stewarts have identified numerous other statements the Whitelocks allegedly made that crossed

18

the line between opinion and fact and were objectively-verifiable, including (but not limited to): (1) the Stewarts neglected and starved the Whitelocks' horses while in their care, causing permanent damage to at least one of their horses; (2) they had "dozens and dozens" of other starving animals on their farm and had committed over thirty "offenses" involving the starvation of horses going back over a decade; (3) Jennifer Stewart had been the subject of animal cruelty charges in Florida and the Whitelocks had records of what she allegedly did in Florida, including a "very thick police file from Florida outlining horrible animal abuse at their farm which was called St Augustine Farms"; (4) Jennifer Stewart sold horses "in batches to Mexico"; (6) there were "dead, decomposing foals on the ground" and "horse parts" on the RHF property. Additionally, Aaron Whitelock posted photos of what he claimed to be his horses that were starved at RHF as well as photos of other horses he suggested were also starved at RHF.

And as explained above, the Stewarts also identified statements to the effect that Jennifer Stewart committed specific acts of fraud involving her position as the IALHA Vice President, including tampering with the organization's computer, using her board position to benefit herself and others, and committing "residency fraud, elections fraud [and] membership fraud." They also identified statements claiming that Jennifer Stewart was the subject of "[m]ultiple tax liens, judgements [and] repossessions," and that there were "lots of people claiming she pulled shady business deals." Most, if not all, of these statements went beyond mere opinion statements and were instead objectively verifiable, making them actionable as defamation.

In sum, the Stewarts have identified a mix of statements, some of which can be considered defamatory and some which cannot. When a legal action is based on a such a mix of statements, a trial court may properly deny a plaintiff's TCPA motion to dismiss, at least with respect to the actionable statements. *See generally Beving v. Beadles*, 563 S.W.3d 399, 409 (Tex. App.—Fort Worth 2018, pet. denied) (when "a legal action is in response to both expression[s] protected

19

by the TCPA and other unprotected activity, the legal action is subject to dismissal [under the TCPA] *only to the extent that it is in response to the protected conduct*, as opposed to being subject to dismissal in its entirety").

It is the movant-defendant's responsibility to segregate the protected conduct from the unprotected; in the absence of any such segregation, a trial court may deny a TCPA motion to dismiss the plaintiff's claim in its entirety. *See Union Pac. R.R. Co. v. Chenier*, 649 S.W.3d 440, 448 (Tex. App.—Houston [1st Dist.] 2022, pet. denied); *see also White Nile Software, Inc. v. Carrington, Coleman, Sloman & Blumenthal, LLP*, No. 05-19-00780-CV, 2020 WL 5104966, at *5 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.) ("[W]hen the pleadings, evidence, and parties' arguments are based on a mix of protected and unprotected activity, and they do not distinguish between the two, a defendant–movant's motion to dismiss under the TCPA should be denied."). Here, the Whitelocks made no attempt to segregate any of the hundreds of statements identified by the Stewarts with regard to whether they rose to the level of actionable defamation. Accordingly, we conclude that the Stewarts presented sufficient evidence to support a prima facie case of defamation to avoid dismissal under the TCPA.

### 3. The Comments Extended to the Entire Stewart Family

In the alternative, the Whitelocks contend that even if we find that there was sufficient evidence to support a prima facie claim of defamation, the evidence only supported a finding that Jennifer Stewart was the target of the Whitelocks' challenged statements and the trial court should have dismissed the defamation claim as to the other family members. This is not a fair assessment of the record.

Although Jennifer Stewart appears to have been the primary focus of the Whitelocks' statements, many of the statements expressly referred to RFH and the Stewart family in general, accusing them globally of starving horses in their care in both Navarro County and Florida and

stating that RHF was under investigation for animal cruelty in Navarro County. Additionally, the Stewarts have identified statements that expressly refer to RHF's owners, Kathy and Donald Stewart, and their son, Steven Stewart, accusing them of widespread animal abuse and further accusing Steven Stewart of driving horses to kill pens for slaughter. Moreover, as set forth above, the Stewarts contend that the Whitelocks were responsible for creating a Facebook page, titled "Royal Horse Farms Revealed," which purported to share "official news and information about [the] Royal Horse Farms investigation[s]," and which contained comments accusing RHF of widespread animal abuse. And as RHF was a family-owned and operated business, statements accusing RHF of starving and neglecting horses reflected on the reputation of the Stewart family.

### 4. *The Damages Element of the Stewarts' Claim*

The Whitelocks next contend that the Stewarts did not present clear and specific evidence to establish their prima facie case of defamation with respect to the damages element of their claim. But the Stewarts were not required to present evidence of their damages, as we determine they alleged a claim for defamation per se (as opposed to defamation per quad), for which damages could be presumed. *See Tatum*, 554 S.W.3d at 624 (distinguishing the two types of defamation); *see also In re Lipsky*, 460 S.W.3d at 596 (citing *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013) (indicating that whether a statement qualifies as defamation per se is a question of law). Defamation per se includes statements accusing someone of committing a crime, or "[r]emarks that adversely reflect on a person's fitness to conduct his or her business or trade[.]" *In re Lipsky*, 460 S.W.3d at 596 (citing *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.–Waco 2005, no pet.); *Hancock*, 400 S.W.3d at 66; ("A statement constitutes defamation *per se* if it 'injures a person in his office, profession, or occupation.'"). Because such statements are "so obviously hurtful," general damages, which include non-economic losses, such as loss of reputation and mental anguish, may be "presumed." *In re Lipsky*, 460 S.W.3d at 596 (citing

*Hancock*, 400 S.W.3d at 63-64, 554 S.W.3d at 624 ("Defamation per se occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages, such as for loss of reputation or for mental anguish.").

There can be little doubt that the Whitelocks' accusations of animal abuse and being the subject of criminal investigations reflected on the Stewarts' fitness to conduct what the Whitelocks acknowledge was their "equine business." *See Cummins*, 2015 WL 1641144, at *12 (where plaintiff was a "wildlife rehabilitator and conservationist," the defendant's statements accusing her of animal neglect were defamatory per se as they adversely affected her fitness for the proper conduct of her lawful profession).

Accordingly, we conclude that the Whitelocks' statements, if false, were defamatory per se, and therefore, the Stewarts were not required to come forward with proof of their damages to survive a TCPA motion.[7] *See In re Lipsky*, 460 S.W.3d at 596 (plaintiff was not required to come forward with evidence of damages in order to defeat the defendant's TCPA dismissal motion where the plaintiff's defamation claim was actionable per se).

## C.      The Third and Final Step: The Whitelocks' Affirmative Defenses

Next, we consider the final step in the analysis, which requires us to determine whether the Whitelocks' two affirmative defenses barred that claim. We conclude that they did not.

The Whitelocks raised two affirmative defenses to the Stewarts' claim of defamation and IIED. First, they alleged that the one-year statute of limitations on the Stewarts' defamation claim ran before the Stewarts filed their lawsuit. Second, they alleged that the Stewarts's claims for

---

[7] We note that special damages, such as the type of economic damages the Stewarts describe in their declarations (including the business losses they claim occurred due to the alleged defamation), are never presumed and must be established with specificity at trial even in cases of defamation per se. *See In re Lipsky*, 460 S.W.3d at 593. However, in order to defeat a TCPA motion, a plaintiff need not establish his special damages with specificity. *Id*. at 596 (trial court properly denied TCPA motion to dismiss without proof of special damages where the plaintiff's claim was actional per se and general damages could be presumed).

defamation and IIED were barred by res judicata and collateral estoppel based on a default judgment that the Stewarts received in a Navarro County statutory county court, in which the Stewarts allegedly sued the Whitelocks based on the same or similar allegations of defamation. We consider each argument in turn.

### 1.  *The Tolling of the Statute of Limitations*

The Whitelocks correctly point out that the statute of limitations for claims for libel and slander is one year. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a). They contend that by the Stewarts' own admissions, the Whitelocks began making their allegedly defamatory statements in July and August of 2019. According to the Whitelocks, the statute began to run at that time, meaning that the statute of limitations ran prior to September of 2020, when the Stewarts first filed their original petition in this matter. We agree with the Stewarts, however, that the statute of limitations was tolled by the Texas Supreme Court's "Twenty-First Emergency Order Regarding The Covid-19 State of Disaster" (the Twenty-First Emergency Order), which was in effect at the time.

> The court's Twenty-First Emergency Order expressly stated:
>
> "Any deadline for the filing or service of any civil case that falls on a day between March 13, 2020, and September 1, 2020, is extended until September 15, 2020. This does not include deadlines for perfecting appeal or for other appellate proceedings, requests for relief from which should be directed to the court involved and should be generously granted."

*Twenty-First Emergency Order Regarding the COVID-19 State of Disaster*, Misc. Docket No. 20-9091 (Tex. July 31, 2020) (available at: https://www.txcourts.gov/supreme/administrative-orders).

Despite the Twenty-First Emergency Order's clear language, the Whitelocks argue that because the Stewarts failed to request an extension based on a need "specifically tied to Covid-19," the statute of limitations was not tolled. We discount their argument, as it is premised upon cases involving Covid-19 emergency orders that were in effect at different times during the

pandemic and further involve questions of whether those orders automatically extended *appellate* deadlines, rather than the deadline for filing or serving a civil case. Here, the Twenty-First Emergency Order automatically tolled the statute of limitations until September 15, 2020, and the Stewarts filed their original petition on September 14, 2020, thus there is no statute of limitations issue.

### 2. *The Doctrines of Res Judicata and Collateral Estoppel*

Finally, the Whitelocks contend that the Stewarts' claims for both defamation and IIED were barred by res judicata and collateral estoppel based on a default judgment the Stewarts received with regard to a lawsuit they filed against the Whitelocks in Navarro County.[8] We conclude that the Whitelocks have not met their burden of establishing that either doctrine bars the Stewarts' claims.

As a preliminary matter, the record does not contain a copy of the statutory county court's judgment or any records of that proceeding. However, the parties appear to agree that the Stewarts sued the Whitelocks for both defamation and IIED in that proceeding and that the trial court issued a no-answer default judgment on the issue of liability in the Stewarts' favor. However, the Stewarts assert, and the Whitelocks do not disagree, that the trial court never resolved the question of the Stewarts' entitlement to damages (if any) and never issued a final judgment in the case.[9] And the Stewarts contend that they were not barred by either the doctrine of res judicata or collateral

---

[8] We note that the Stewarts filed yet another lawsuit against the Whitelocks in the Navarro statutory county court in September of 2019 but voluntarily nonsuited the case in December of that year. The taking of a voluntary nonsuit, however, does not constitute litigation of the issues in a case and therefore does not prejudice the parties against seeking the same relief in a subsequent lawsuit. *See Welch v. Hrabar*, 110 S.W.3d 601, 607 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (recognizing that if a plaintiff takes a voluntary nonsuit, res judicata does not impede subsequent actions).

[9] According to the Stewarts, the delay occurred because they were awaiting a forensic accountant's damages report and because the Whitelocks filed a motion that was still pending. We have no record of the status of the proceedings or why there is presumably no final judgment in that case.

estoppel from filing their lawsuit in the district court, as they never received a final judgment on any of their claims in the statutory county court. We agree.[10]

"The doctrine of res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action." *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 595 (Tex. App.— Houston [14th Dist.] 2000, no pet.) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996)). Likewise, "[a] prior adjudication of an issue will be given estoppel effect only if it was adequately deliberated and firm." *Frost Nat'l Bank*, 29 S.W.3d at 595 (citing *Mower v. Boyer*, 811 S.W.2d 560, 562 (Tex. 1991)). Such an adjudication "requires a showing that: (1) the parties were fully heard; (2) the court supported its decision with a reasoned opinion; and (3) the decision was subject to appeal or was in fact reviewed on appeal." *Id.* (citing *Mower*, 811 S.W.2d at 562). In other words, both doctrines require a final judgment to bar a subsequent proceeding. *Id.* (citing *Mower*, 811 S.W.2d at 562) (recognizing that a partial summary judgment that was not a final appealable order could not support a plea of res judicata or collateral estoppel); *see also In re USAA Gen. Indem. Co.*, 629 S.W.3d 878, 883–84 (Tex. 2021) (where "the essential requirement of a final judgment [was] lacking" in an earlier proceeding, the doctrine of collateral estoppel was inapplicable).

We recognize that a default judgment can be considered a final judgment for purposes of either res judicata or collateral estoppel, but only if the judgment can be considered truly final. *See Matter of Marriage of Mouret*, No. 14-20-00050-CV, 2021 WL 1184190, at *3 (Tex. App.—

---

[10] In the trial court, as well as on appeal, the Whitelocks contend that the two lawsuits were based on the same contention that the Whitelocks defamed them by accusing them of animal cruelty and were based on the same allegedly defamatory statements that were posted on social media sites. However, because we conclude that the Whitelocks failed to establish the existence of a final default judgment that barred the Stewarts from filing the current lawsuit, we need not consider whether the allegations were the same in both lawsuits.

Houston [14th Dist.] Mar. 30, 2021, no pet.) (mem. op.) (recognizing that a default judgment can constitute a determination on the merits for res judicata purposes); *Sprowl v. Taylor*, No. 05-01-01140-CV, 2003 WL 57743, at *3 (Tex. App.—Dallas Jan. 8, 2003, pet. denied) (mem. op) (citing *Mendez v. Haynes Brinkley & Co.*, 705 S.W.2d 242 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) (applying collateral estoppel after a default judgment). A no-answer default judgment *on the issue of liability only* is not a final judgment when a plaintiff seeks unliquidated damages; in that instance, the trial court must hear evidence of damages before entering a final judgment. *See* TEX. R. CIV. P. 243 ("If the cause of action is unliquidated or be not proved by an instrument in writing, the court shall hear evidence as to damages and shall render judgment therefor . . ."); *see also Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992) ("Once a default judgment is taken on an unliquidated claim, all allegations of fact set forth in the petition are deemed admitted, except the amount of damages, and a court rendering a default judgment must hear evidence of any such damages"); *Sherman Acquisition II LP v. Garcia*, 229 S.W.3d 802, 808–09 (Tex. App.—Waco 2007, no pet.) (recognizing that court must hear evidence of unliquidated damages prior to entering a final judgment in a default case). Accordingly, a default judgment on the issue of liability only is considered interlocutory in nature. *See Houston Health Clubs, Inc. v. First Court of Appeals*, 722 S.W.2d 692, 693–94 (Tex. 1986) (per curiam) (default judgment that did not resolve issue of punitive damages was interlocutory); *TexPro Constr. Group, LLC v. Davis*, No. 05-14-00050-CV, 2015 WL 4984856, at *2–3 (Tex. App.—Dallas Aug. 19, 2015, no pet.) (mem. op.) (treating trial court's no-answer default judgment on liability as being interlocutory).

Here, the record contains no evidence that the Navarro County court issued a final judgment on damages, thus the Whitelocks did not meet their burden of establishing that the Stewarts' suit was barred by either res judicata or collateral estoppel.

## VI. THE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Next the Whitelocks argue the trial court erred by denying its motion to dismiss the Stewarts' IIED claim. We disagree.

### A. Applicable Law

An intentional infliction of emotional distress claim requires proof that: "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *MVS Int'l Corp.*, 545 S.W.3d at 203 (citing *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (per curiam)); *see also Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). IIED was judicially created to allow recovery in "those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *MVS Int'l–Corp.*, 545 S.W.3d at 203 (quoting *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004)). Thus, "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Hoffmann-La Roche Inc.*, 144 S.W.3d at 447; *see also Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005) (where plaintiff's complaints were covered by other statutory remedies, she could not assert them as intentional infliction claims). An IIED claim based solely on alleged defamatory statements is subject to dismissal under the TCPA, as the plaintiff's remedy in that instance is to file a defamation claim against the defendant. *See Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 789 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) (holding that plaintiff's IIED claim could not proceed under the TCPA because it was based on the plaintiff's defamation claim).

**B.     Analysis: The Stewarts Made Allegations Beyond the Scope of the TCPA**

Here, the Whitelocks contend that the Stewarts' IIED claim stemmed solely from the allegedly defamatory statements the Whitelocks made on their social media posts. We disagree. The Stewarts alleged that the Whitelocks made a variety of other threats of physical harm and conduct that were independent of their defamation claim. In particular, they allege that the Whitelocks made "death threats, threats of arson, theft, and trespass" and that Aaron Whitelock allegedly engaged in threatening conduct toward Jennifer Stewart at an IALHA horse show and later caused physical damage to her property. Although we express no opinion on whether the Stewarts' allegations would be sufficient to raise a question of fact on each of the elements of their IIED claim, these allegations go beyond the defamation claim allegations. *See Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at \*20 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.) (where plaintiff made factual allegations in support of his IIED claim, which were independent of his claims for defamation, the trial court did not err in refusing to dismiss the IIED claim).

For similar reasons, we conclude that the TCPA does not apply to the Stewarts' claim that the Whitelocks engaged in threatening, assaultive, and destructive conduct, as such conduct cannot be considered a protected communication about a matter of public concern within the meaning of the TCPA. *See, e.g.*, *Sanchez v. Striever*, 614 S.W.3d 233, 245–46 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (holding that protesters' actions in assaulting plaintiff was not a protected communication under the TCPA); *Universal Plant Services, Inc. v. Dresser-Rand Group, Inc.*, 571 S.W.3d 346, 371 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (Keyes, J., concurring) (claims that defendants engaged in various torts, including conversion, theft, and breach of contract, were not the types of claims that fell "within the type of conduct or communication covered by the TCPA"); *Neely v. Allen*, No. 14-19-00706-CV, 2021 WL 2154125,

at *9 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (mem. op.) (plaintiff's claims for various torts, including assault, IIED and conversion did not fall within the scope of the TCPA as they did not involve protected speech or conduct). Consequently, we cannot say that the Stewarts' IIED claim, which involved allegations of both threatening and assaultive conduct, was either "based on or [was] in response to" the Whitelocks' exercise of their right to free speech as that term is used in the TCPA.[11] *See Chenier*, 649 S.W.3d at 446 (concluding that defendant did not meet its burden of establishing that the plaintiff's claims for negligence and nuisance were "based on" or "in response" to the defendant's protected communications within the meaning of the TCPA) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3)); *Serafine v. Blunt*, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.) (where tortious-interference counterclaim was based in part on opposing party's alleged threats made outside the context of the lawsuit, the opposing party did not satisfy her initial burden to show that these portions of the claims were subject to the TCPA).

Moreover, we note that even if some of the Stewarts' allegations in their IIED claim overlapped with their defamation claim, this would still not subject the IIED claim to dismissal under the TCPA per the discussion above regarding a trial court properly denying a TCPA motion to dismiss in cases involving a mix of protected and unprotected conduct that the defendant-movant has not parsed out.

Given our resolution of this issue, we need not address whether the allegations set forth rise to the level of extreme or outrageous conduct as required to support an IIED claim or whether

---

[11] The former version of the TCPA was broader in nature and allowed a movant to seek dismissal based on a showing that the claim against him was "based on, relates to, or is in response to" the movant's exercise of a protected right; however, the Legislature narrowed the scope of the TCPA's applicability in the current version of the Act, which is applicable to this case, by omitting the "relates to" provision. *ML Dev, LP v. Ross Dress for Less, Inc.*, 649 S.W.3d 623, 626 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (op. on reh'g) (citing Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684). In turn, this increased the burden on a movant seeking dismissal of the claims against him under the Act. *ML Dev, LP*, 649 S.W.3d at 626 (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a), 27.005(b) (current version); Laura Lee Prather & Robert T. Sherwin, *The Changing Landscape of the Texas Citizens Participation Act*, 52 Tex. Tech L. Rev. 163, 169 (2020) (noting that deletion of "relates to" increases burden on movants seeking dismissal)).

the Stewarts came forward with any proof that the Whitelocks engaged in any of the allegedly threating conduct. *See MVS Int'l Corp.*, 545 S.W.3d at 203 (requiring evidence of extreme and outrageous conduct to support an IIED claim).

## VII.   THE STEWARTS' REMAINING CLAIMS

Last, we turn to the Stewarts' claims of civil conspiracy; aiding and abetting; and ratification, and the Whitelocks' contention that the Stewarts did not meet their burden of establishing a prima facie case in support of any of these three claims. Because we do not treat these claims as "independent torts" and because their existence is derivative of the Stewarts' defamation claim, we conclude that the trial court properly denied the Stewarts' motion to dismiss them under the TCPA.

### A.    The Claims for Civil Conspiracy and Aiding and Abetting

The Texas Supreme Court has held that civil conspiracy is not an independent tort; instead, it is a theory of vicarious liability by which a plaintiff may seek to hold another individual liable for the commission of an unlawful act that the individual did not commit but that his co-conspirator did. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019). It is therefore a "derivative claim" that depends on the existence of an "underlying tort that is the object of the conspiracy." *Id*. at 148. Similarly, the Texas Supreme Court has held that "aiding and abetting" is a theory of "derivative or vicarious liability" that depends on the existence of an underlying tort. *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 738 (Tex. 2020) (recognizing that both "[a]iding and abetting and conspiracy are theories of derivative or vicarious liability") (citing *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 85–86 (Tex. 2015). These "liability-spreading theories depend upon liability for an underlying tort, and they survive or fail alongside that tort." *Id.* (citing *Agar Corp.*, 580 S.W.3d at 141).

When a defendant brings a TCPA motion seeking to dismiss a derivative claim of either "civil conspiracy" or "aiding and abetting," the court need only analyze the issue of whether the underlying tort upon which those claims rely survives the motion. *See, e.g.*, *Thibodeaux v. Starx Inv. Holdings, Inc.*, No. 03-20-00613-CV, 2021 WL 4927417, at *11 (Tex. App.—Austin Oct. 22, 2021, pet. dism'd) (mem. op.). And if the underlying tort survives the motion, i.e., the plaintiff meets its burden of establishing a prima facie case of the underlying tort, the court need not separately analyze whether the plaintiffs established a prima facie case on their derivative claims. *Id.* (citing *Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 814 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) ((quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding), for proposition that "courts 'do not analyze the trial court's refusal to dismiss plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action'" because conspiracy is a derivative tort)).

Here, the Stewarts' claims for civil conspiracy and aiding and abetting are based on the underlying tort of defamation, i.e., that Aaron and Donna Whitelock conspired to defame the Stewarts, and, in essence, to ruin their business. Since we have already concluded that the Stewarts met their prima facie case burden on defamation (and that no affirmative defenses barred their defamation claim), we need not independently review their derivative claims. Accordingly, the trial court did not err by denying the Whitelocks' motion to dismiss those two "claims."

## B.     The Claim for "Ratification"

We reach a similar conclusion on the Stewarts' claim for "ratification." In their First Amended Petition under the heading "Ratification," the Stewarts alleged that "Each Defendants [sic] ratified the libel, slander, and/or intentional infliction of emotional distress committed by all other Defendants through approving such conduct after acquiring full knowledge of the same with the intent of giving validity to the tortious conduct." Ratification is a party's agreement to be bound

31

by another party's act after the fact; at most, any such claim is yet another method of holding a person vicariously liable for another's action. *See generally BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021). Accordingly, we treat the Stewarts' ratification "claim" as being a derivative claim which is, at least in part, dependent on the Stewarts' defamation claim. Since we have already concluded that the Stewarts' defamation claim survives the Whitelocks' TCPA motion, we need not independently review the validity of the ratification claim.

In summary, we agree with the Whitelocks that at least a portion of their challenged communications constituted protected speech under the TCPA and did not fall within the commercial speech exception to the TCPA, and we therefore sustain Issues Three and Four. However, we conclude that: (1) the Stewarts met their burden of establishing a prima facie case of defamation; (2) the Stewarts made factual allegations in support of their IIED claim that did not fall within the purview of the TCPA; and (3) the Stewarts' remaining claims were all of a derivative nature and therefore did not warrant an independent review under the TCPA. We overrule the Whitelocks' remaining issues: Issues Five, Six, and Seven.

## VIII. CONCLUSION

For the reasons set forth above, we affirm the trial court's judgment denying the Whitelocks' TCPA motion to dismiss.

LISA J. SOTO, Justice

February 8, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.